JUSTICE LEAPHART
delivered the Opinion of the Court.
¶1 The jury convicted Gregory Mizenko (Mizenko) of his third offense of Partner or Family Member Assault in violation of § 45-5-206, MCA. During trial, the District Court admitted a number of hearsay statements from the victim, Mizenko’s wife, Debra. Mizenko appeals. We affirm.
¶2 The issue is: Were Debra’s statements testimonial?[1]
BACKGROUND
¶3 The Chouteau County Attorney filed an information charging Mizenko with Partner or Family Member Assault in violation of § 45-5-206, MCA. Dawn Grove, the Mizenkos’ neighbor, testified at trial that Debra was out of breath when she appeared at the Groves’ house late one afternoon. Debra had a wound on her cheek or jaw area. Grove testified that Debra asked her to call 911 as well as a friend, Carol Richard. Grove called 911 and handed the phone to Debra. Tami King answered the 911 call.
¶4 Although the State subpoenaed Debra, she failed to appear at trial. Grove testified that Debra “said that her husband had been drinking *302 and was trying to hurt her.” Seeking clarification of Debra’s statement to her, the prosecutor asked Grove: “And you stated that he had been drinking and had hurt her?” Yes,” Grove replied.
¶5 Presumably relying on the excited utterance exception of Rule 803(2), M.R.Evid., the District Court overruled an objection to the following testimony from King about her conversation with Debra.
[Prosecution]: Do you recall what Mrs. Mizenko told you?
[King]: She said that Greg hit her, pushed her down and she had hair-he had pullen [sic] out her hair.
[Prosecution]: Okay. Did she request law enforcement?
[King]: Yes. She wanted him arrested, is what she said.
Without objection from Mizenko, the court also allowed the prosecution to play the audiotape of the 911 call for the jury. On the tape, Debra, breathing heavily and in a cracking and wavering voice, states, “he hit me, pulled out my hair, knocked me down. I tried so hard not to call [gasp], but umm, this is ridiculous. I can’t do this anymore.”
¶6 Officer Scott Buennemeyer testified that when he arrived at the Mizenko home, he saw a bruise on Debra’s face. As he walked through the house, he saw pens and pencils and dog food on the floor of the kitchen. He saw a lock of hair near the pet bowl in the kitchen and another lock of hair on the floor in the living room. The District Court twice sustained foundational objections to Buennemeyer’s testimony that the hair was Debra’s. Finally, the prosecution asked Buennemeyer, “Did Debra Mizenko tell you where this hair came from?” Overruling Mizenko’s hearsay objection, the District Court allowed Buennemeyer to answer. He testified, ‘Yes, she did. She told me it was her hair, pulled from her head, during an altercation at her residence, at that time and date.”
¶7 After the State rested, Mizenko objected to the hearsay statements from Grove, King and Buennemeyer, arguing that they denied him his right to confrontation. The District Court ruled that Mizenko’s cross-examination of the witnesses who had contact with Debra satisfied his Sixth Amendment right to confrontation. The jury found Mizenko guilty by a unanimous verdict.
STANDARD OF REVIEW
¶8 We will review a district court’s evidentiary decision to determine whether it abused its discretion. State v. Cameron, 2005 MT 32, ¶ 14, 326 Mont. 51, ¶ 14, 106 P.3d 1189, ¶ 14. There is no discretion, however, in properly interpreting the Sixth Amendment. See Cooper Industries, Inc. v. Leatherman Tool Group, Inc. (2001), 532 U.S. 424, 456-36, 121 S.Ct. 1678, 1685-86, 149 L.Ed.2d 674, 686-87 (indicating *303 that de novo review is appropriate when applying a constitutional standard or concept, not capable of precise articulation, to the facts of a particular case); Crawford v. Washington (2004), 541 U.S. 36, 42, 124 S.Ct. 1354, 1359, 158 L.Ed.2d 177, 187 (applying de novo review to the Washington Supreme Court’s application of the Sixth Amendment, albeit without expressly articulating any standard of review). We review a district court’s conclusions of law and interpretations of the Constitution or the rules of evidence, de novo. State v Villanueva, 2005 MT 192, ¶ 9, 328 Mont. 135, ¶ 9, 118 P.3d 179, ¶ 9; State v. Mathis, 2003 MT 112, ¶ 8, 315 Mont. 178, ¶ 8, 68 P.3d 756, ¶ 8; see United States v. Blue Bird (8th Cir. 2004), 372 F.3d 989, 991.
DISCUSSION
I. Crawford Changes the Landscape
¶9 “In all criminal prosecutions, the accused shall enjoy the right... to be confronted with the witnesses against him.” U.S. Const, amend. VI. Until recently, the Supreme Court had allowed courts to admit hearsay when that evidence bore “adequate ‘indicia of reliability.’” Ohio v. Roberts (1980), 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597, 608 (citation omitted). Further, “Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception” or if the evidence has “particularized guarantees of trustworthiness.” Roberts, 448 U.S. at 66,100 S.Ct. at 2539,65 L.Ed.2d at 608. Thus, under Roberts, the rules of evidence subsumed any substantive restrictions the Sixth Amendment had placed on admitting hearsay.
¶10 In 2004 the United States Supreme Court decided Crawford v. Washington (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177, in which the Court dramatically bifurcated hearsay law from the Confrontation Clause. The Confrontation Clause of the Sixth Amendment allows courts to admit hearsay against criminal defendants in only two instances: (1) if the hearsay is testimonial, the defendant must have had an opportunity to cross-examine the declarant and the prosecution must show that the declarant is unavailable to appear at trial, Crawford, 541 U.S. at 59, 124 S.Ct. at 1369, 158 L.Ed.2d at 197; or (2) if the hearsay is nontestimonial, the hearsay must bear adequate indicia of reliability or particularized guarantees of trustworthiness. Crawford, 541 U.S. at 68, 124 S.Ct. at 1374, 158 L.Ed.2d at 203. In Crawford, although the Supreme Court gave numerous examples, it specifically declined to define what constitutes “testimonial” evidence. Crawford, 541 U.S. at 68, 124 S.Ct. at 1374, 158 L.Ed.2d at 203. *304 Mizenko’s case forces this Court to deal with the definitional void left by Crawford.
II. Testimonial vs. Nontestimonial
¶11 Testimony is “ ‘[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.’ ” Crawford, 541 U.S. at 51, 71, 124 S.Ct. at 1364, 1375, 158 L.Ed.2d at 192, 205 (quoting 1 N. Webster, An American Dictionary of the English Language (1828)) (emphasis added). However, “[hjearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” Rule 801(c), M.R.Evid. Debra’s statements to Grove, King, and Buennemeyer are all clearly hearsay. As Crawford recognizes, though, whether the statements are testimonial is a separate issue. Unfortunately, the facts of this case do not fit neatly within Crawford’s examples of testimonial or nontestimonial.
¶12 Mizenko proffers that all hearsay is testimonial if it is (1) substantive and (2) accusatorial. While appealing in its clarity and ease of application, this definition is overly broad; it would require courts to exclude more evidence than the Sixth Amendment requires. Specifically, the Supreme Court has decided that, although a statement may be substantively accusatory, the Sixth Amendment would not exclude “[a]n off-hand, overheard remark,” albeit accusatory, because such an off-hand remark “ bears little resemblance to the civil-law abuses the Confrontation Clause targeted,” Crawford, 541 U.S. at 51, 124 S.Ct. at 1364, 158 L.Ed.2d at 192.
¶13 In the cross-examination essential to the adversarial system, the defendant tests the witness’s testimony in the most rigorous, demanding, and exacting test. Crawford, 541 U.S. at 61, 124 S.Ct. at 1370, 158 L.Ed.2d at 199. Through cross-examination, the defendant can delve into the witness’s story and potentially reveal inherent flaws, inconsistencies, and insidious motives. Indeed, John Henry Wigmore called cross-examination the “‘greatest legal engine ever invented for the discovery of truth.’” California v. Green (1970), 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489, 497 (quoting 5 John Henry Wigmore, A Treatise on the Anglo-American System of Evidence in Trials at Common Law § 1367 (3d ed. 1940)).
¶14 Contrary to the holding in Roberts that allowed courts to decide whether testimony has “adequate indicia of reliability” or “particularized guarantees of trustworthiness,” 448 U.S. at 66, 100 S.Ct. at 2539, 65 L.Ed.2d at 608, the Sixth Amendment itself defines the indicia of reliability and guarantees of trustworthiness necessary to admit testimonial evidence. The Sixth Amendment establishes *305 confrontation through cross-examination as the minimally adequate index of reliability and guarantee of trustworthiness. Crawford, 541 U.S. at 61, 124 S.Ct. at 1370, 158 L.Ed.2d at 199. (“It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.”)
¶15 Testimonial evidence requires a more demanding test of reliability than non-testimonial evidence because the framers intended to protect the defendant from the evils inherent in testimonial evidence. Through example, Crawford highlights one particular evil: “First, the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of ex parte examinations as evidence against the accused.” Crawford, 541 U.S. at 50,124 S.Ct. at 1363, 158 L.Ed.2d at 192. Crawford elaborates on the two concerns engendered by this evidence. The first is the concern with possible prosecutorial misconduct and overzealousness:
The Framers would be astounded to learn that ex parte testimony could be admitted against a criminal defendant because it was elicited by “neutral” government officers. But even if the court’s assessment of the officer’s motives was accurate, it says nothing about Sylvia’s perception of her situation. Only cross-examination could reveal that.
Crawford, 541 U.S. at 66, 124 S.Ct. at 1373, 158 L.Ed.2d at 202. In identifying the possible purposes behind the protections afforded by the Confrontation Clause, Professor Mosteller notes that this concern may manifest in either of two ways: “government[al] manipulation of the witness in creating the evidence-manipulating the words uttered”; or “governmental manipulation of the recording of the statement rather than manipulation of what was said.” Robert P. Mosteller, Crawford v. Washington: Encouraging and Ensuring the Confrontation of Witnesses, 39 U. Rich. L. Rev. 511, 569-70 (2005).
¶16 The second concern is with the declarant’s opportunity to abuse the criminal justice system in order to punish, to exact revenge on, or to shift the blame to the defendant.[2] The trial of Sir Walter Raleigh, as quoted in Crawford, illustrates this danger:
Lord Cobham, Raleigh’s alleged accomplice, had implicated him in an examination before the Privy Council and in a letter. At Raleigh’s trial, these were read to the jury. Raleigh argued that *306 Cobham had lied to save himself: “Cobham is absolutely in the King’s mercy; to excuse me cannot avail him; by accusing me he may hope for favour.”
Crawford, 541 U.S. at 44, 124 S.Ct. at 1360, 158 L.Ed.2d at 188 (quoting 1D. Jardine, Criminal Trials 435 (1832)). As the Sixth Circuit has noted, cross-examination is essential to expose possible bias or motive of the declarant:
Indeed, the danger to a defendant might well be greater if the statement introduced at trial, without a right of confrontation, is a statement volunteered to police rather than a statement elicited through formalized police interrogation. One can imagine the temptation that someone who bears a grudge might have to volunteer to police, truthfully or not, information of the commission of a crime, especially when that person is assured he will not be subject to confrontation.
United States v. Cromer (6th Cir. 2004), 389 F.3d 662, 675.
¶17 Crawford characterizes “a casual remark to an acquaintance” as nontestimonial. Crawford, 541 U.S. at 51, 124 S.Ct. at 1364, 158 L.Ed.2d at 192. The word “casual,” rather than modifying the setting in which the declarant made the statement, modifies the declarant’s assumption as to what use, if any, the listener might make of the statement. When an objective declarant would reasonably expect the state to use her statements at trial, the Sixth Amendment demands that courts exclude such statements absent an opportunity for confrontation. United States v. Saget (2nd Cir. 2004), 377 F.3d 223, 228-29; Horton v. Allen (1st Cir. 2004), 370 F.3d 75, 84.
¶18 When speaking to government agents or officials, the circumstances are such that a declarant should reasonably expect that the government will seek to use those statements at trial. Whereas when a declarant speaks with her neighbor across the backyard fence, she has much less of an expectation that the government will make prosecutorial use of those statements. Any situation in which the declarant is knowingly speaking to the police or government agents implicates concerns both with the declarant’s motivation and with the possibility of prosecutorial misconduct. The declarant expects and understands that the government may use her statements at trial, and the police may deliberately or inadvertently color the substance of their statements to reflect their own prejudices and understandings of the situation, or may selectively record the declarant’s statements.
¶19 Likewise, when the declarant signs an affidavit or gives a recorded statement, the declarant expects that the state will seek to make use of those statements. See White v. Illinois (1992), 502 U.S. 346, 365, 112 *307 S.Ct. 736, 747, 116 L.Ed.2d 848, 865 (Thomas, J., joined by Scalia, J., concurring in part and concurring in the judgment). Although the government may not be directly involved in obtaining recorded or sworn testimony, a declarant who provides such testimony clearly anticipates that the state may use the statements against an accused. See White, 502 U.S. at 365, 112 S.Ct. at 747, 116 L.Ed.2d at 865 (“extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,” implicate the Confrontation Clause) (Thomas, J., joined by Scalia, J., concurring in part and concurring in the judgment) (quoted in Crawford, 541 U.S. at 51-52,124 S.Ct. at 1364,158 L.Ed.2d at 193 (ellipses in quotation)); see also Richard D. Friedman, The Confrontation Clause Re-Rooted and Transformed, 2004 Cato Sup. Ct. Rev. 439, 458 (“Thus, if just before trial a person shoved a written statement under the courthouse door, asserting that the accused did in fact commit the crime, that would plainly be testimonial even though no government official played a role in preparing the statement.”).
¶20 A declarant who is alerting law enforcement of imminent and immediate danger has much less of an expectation that the state will seek to make prosecutorial use of her statements at trial. United States v. Brun (8th Cir. 2005), 416 F.3d 703 (911 call from adolescent boy regarding an argument escalating into an assault); see People v. Moscat (N.Y. Crim. Ct. 2004), 3 Misc.3d 739, 746 (deciding that a 911 call “is the electronically augmented equivalent of a loud cry for help”); Leavitt v. Arave (9th Cir. 2004), 383 F.3d 809, 830 n.22 (determining that statements to police by a victim of an attempted break-in identifying the perpetrator are nontestimonial because they were volunteered in order to end “a frightening intrusion into her home”); People v. Coleman (N.Y. App. Div. 2005), 16 A.D.3d 254, 255 (“[t]he information conveyed by the 911 caller was for the purpose of urgently seeking police intervention”; “we note that the caller repeatedly emphasized that one or both of the victims was ‘bleeding real bad.’ This indicates that his primary motivation was to call for urgent assistance, and not to phone in an anonymous accusation”). Whether a reasonable declarant would expect statements made during a call to 911 to be used prosecutorially will depend on the content of the conversation and the particular circumstances that led to the call being placed.
¶21 We do not assume that a declarant speaking to her neighbor across the backyard fence reasonably expects that the government will seek to use her statements as testimony. For most people, none of their “casual” remarks ever surface in court. Seldom do people make such “casual remark[s],” Crawford, 541 U.S. at 51, 124 S.Ct. at 1364, 158 L.Ed.2d at *308 192, with “any anticipation by the speaker that the statement will be conveyed beyond the immediate audience, let alone that it will be used at trial,” Mosteller, 39 U. Rich. L. Rev. at 573. In United States v. Franklin (6th Cir. 2005), 415 F.3d 537, the court held that where a declarant Clarke’s statements were to a friend, Wright, they were nontestimonial. “Clarke made the statements to his friend by happenstance; Wright was not a police officer or a government informant seeking to elicit the statements to further a prosecution against Clarke or Frankin. To the contrary, Wright was privy to Clarke’s statements only as his friend and confidant.” Franklin, 415 F.3d at 545; United States v. Gibson (6th Cir. 2005), 409 F.3d 325, 338 (describing statements as nontestimonial where the “statements were not made to the police or in the course of an official investigation... [nor in an attempt] to curry favor or shift the blame”); United States v. Manfre (8th Cir. 2004), 368 F.3d 832, 838 n.1 (“Mr. Rush’s comments were made to loved ones or acquaintances and are not the kind of memorialized, judicial-process-created evidence of which Crawford speaks”); United States v. Lee (8th Cir. 2004), 374 F.3d 637, 645 (“Kehoe’s statements to his mother do not implicate the core concerns of the confrontation clause”). Likewise, many state courts have been less apt to conclude that statements made to personal acquaintances are testimonial. See, e.g., People v. Cervantes (Cal. Ct. App. 2004), 12 Cal.Rptr.3d 774, 777, 782-83 (deciding that statements made to a neighbor from whom the declarant sought medical assistance, which described a murder and implicated the declarant and others, were not testimonial under any of the formulations provided in Crawford)-, State v. Rivera (Conn. 2004), 844 A.2d 191, 201-02 (determining that a statement made to the declarant’s nephew describing a botched robbery-turned-murder undertaken by the declarant and an accomplice was nontestimonial); Demons v. State (Ga. 2004), 595 S.E.2d 76, 78-80 (holding that a statement made to the declarant’s co-worker indicating that the declarant’s bruises came from beatings inflicted by his domestic partner whom he feared would kill him was nontestimonial).
¶22 In State v. Carter, 2005 MT 87, 326 Mont. 427, 114 P.3d 1001, we held that the weekly field certification reports that the state introduced to show that the Intoxilizer 5000 was functioning properly when it was administered by the police, were nontestimonial. We reasoned that the reports were “not substantive evidence of a particular offense, but rather are foundational evidence necessary for the admission of substantive evidence. In other words, the certification reports are nontestimonial in nature in that they are foundational, rather than substantive or accusatory.” Carter, ¶ 32 (internal citation omitted). The *309 Sixth Amendment, itself, extends only to “witnesses against” the defendant, and hearsay provided for foundational purposes is not evidence “against” the defendant. Thus, while the author of the certification reports could reasonably anticipate that the reports would be used in or by a court, those reports, because “not substantive evidence of a particular offense,” were held to be nontestimonial. See Crawford, 541 U.S. at 56, 124 S.Ct. at 1367, 158 L.Ed.2d at 195-96 (business records are nontestimonial); United States v. Cervantes-Flores (9th Cir. 2005), 421 F.3d 825, 831-34 (immigration records nontestimonial); United States v. Garner (6th Cir. 2005), 2005 WL 2175907 (unpublished) (medical records nontestimonial).
¶23 Bringing together these rationales, generally, when a declarant knowingly speaks to a police officer or governmental agent, her statements are presumed testimonial. If, however, the declarant had objective reason to believe that her statement would serve only to avert or mitigate an imminent or immediate danger and the agent who received the statement had no intent to create evidence, the statement is presumed to be nontestimonial. Alternatively, unless the declarant had clear reason to believe that the statement would be used in court as substantive evidence against the defendant, her statements to a nongovernmental agent are nontestimonial.[3]
HI. Debra Mizenko’s Statements at Issue
¶24 Mizenko’s appeal presents three instances of statements by Debra Mizenko, who did not appear at trial and whom Mizenko was unable to cross-examine: (1) Debra’s statements to her neighbor Dawn Grove, (2) Debra’s statements to 911 dispatcher Tami King, and (3) Debra’s statements to Deputy Buennemeyer.
¶25 Mizenko argues that the court erred in allowing Dawn Grove to testify that Debra told her that Mizenko had been drinking and was trying to hurt her; in allowing the police dispatcher Tami King to testify as to the contents of the 911 tape, in particular that Mizenko had pushed Debra down, hit her and pulled her hair out; and in allowing *310 Deputy Buennemeyer to testify that Debra told him that the hair on the floor was hers and had been pulled out during the altercation with Mizenko.
¶26 In discussing these issues, it must be noted that the State, through witness King, offered the 911 taped conversation as evidence. Since King stated that she had not listened to the tape and could not verify its accuracy, Mizenko objected for lack of foundation. The court sustained the objection. During a break, King listened to the tape and was subsequently able to testify that it was an accurate representation of the conversation. The tape was then admitted without objection and was played for the jury. During the taped conversation, Debra told King that Mizenko had hit her, pushed her down, and pulled out her hair. Since Debra’s taped statements that Mizenko had pulled out her hair were admitted without objection, King’s and Buennemeyer’s testimony concerning the hair pulling, even if objectionable, was cumulative and, thus, harmless error. State v. Van Kirk, 2001 MT 184, ¶ 43, 306 Mont. 215, ¶ 43, 32 P.3d 735, ¶ 43. Likewise, King’s statements that Mizenko had pushed Debra down and hit her constitute harmless error, at most. ¶27 [4] As to witness Dawn Grove, she was Debra’s neighbor. Debra appeared at Dawn’s house late one afternoon, out of breath and bruised on the cheek. She was seeking assistance after having been beaten by her husband. Given that she was in distress and addressing a nongovernmental agent, her neighbor, she had no objective reason to believe or anticipate that her statement would be used in court. See Mosteller, 39 U. Rich. L. Rev. at 573 (indicating that “most private statements, even if accusatory, are not candidates for being considered testimonial”). The most reasonable construction of Debra’s statement to Grove is that Debra merely endeavored to provide Grove with a context that would explain Debra’s sudden appearance, with dog in tow and a freshly bruised face, on her neighbor’s doorstep. Her utterance also enabled Debra to share the burden of a traumatic beating, a need evidenced by the fact that she sought the immediate solace that her neighbor could provide as well as her desire to phone her friend Carol Richard. To the extent that the statement can be construed in any other manner, it is fairly characterized as primarily a cry for help. Debra, having fled her own home where her husband had just beaten her, sought sanctuary from which to take her next step. Significantly, Debra apparently did not feel sufficiently secure in her own home to remain there and phone either her friend Carol Richard or 911. In light of the abuse she suffered and the very real possibility that Mizenko would return and continue the assault, her fear of remaining in her home was well founded. Debra’s cursory explanation of the circumstances that *311 prompted her to request Grove’s assistance, though evidence, were not created by the judicial process. Debra lacked reason to believe that her statement would be used prosecutorially as substantive evidence against Mizenko. If she had anticipated such use, in all likelihood, she would have divulged greater detail, as she later did when speaking with 911 operator King, and indicated that her husband had in fact hurt her, not merely that he was trying to hurt her. Accordingly, her statement to Grove was nontestimonial and the admission of Dawn Grove’s hearsay testimony did not offend the confrontation clause.
¶28 Ruling on the admissibility of statements made in a remarkably similar situation, the Colorado Supreme Court recently rendered a decision that mirrors our conclusion that Debra’s statement to Grove was not testimonial. In Compan v. People (Colo. 2005), 121 P.3d 876, the Colorado Court unanimously[4] affirmed the admission of hearsay statements made by a woman shortly after suffering abuse at the hands of her husband and describing that abuse in detail. During a heated argument with her husband, the victim, while crying, had called her friend Vargas and asked her to come pick her up. Compan, 121 P.3d at 877. About twenty minutes later, the victim, now “subdued, very quiet and sad” again called Vargas, reported that her husband had already hit her, and again requested a ride. Compan, 121 P.3d at 877. Another fifteen minutes elapsed before Vargas arrived to whisk the victim away to the secure environs of Vargas’s home. During the ride, the victim, who was biting her nails, shaking and crying, explained that her husband had kicked and punched her stomach, “slapped her, pulled her hair, and thr[own] her against a wall.” Compan, 121 P.3d at 878. When they arrived at Vargas’s house, the victim continued recounting the assault and eventually asked Vargas to call the police. The victim did not testify at trial.[5] Compan, 121 P.3d at 878. The Colorado Court considered each of the three formulations of “testimonial” postulated by the Crawford Court and unanimously concluded that the victim’s excited utterances to Vargas did not fall within any of them. See Compan, 121 P.3d at 880-81 (“the victim’s statements were not made under circumstances which would lead an objective witness reasonably *312 to believe that the statement would be available for use at a later trial. Rather, the victim was speaking informally to her friend”); see also Mosteller, 39 U. Rich. L. Rev. at 544 (indicating that under his proposed method for ascertaining whether a statement is testimonial, “the statements in Compan and similar fact patterns would not be considered testimonial”). Furthermore, the Colorado Court concluded that “the constitutionality of nontestimonial statements is controlled by the federal confrontation clause as set forth in Roberts.” Compan, 121 P.3d at 881 (citing a litany of cases from federal circuit courts and state supreme courts that have reached the same conclusion).
¶29 As to the dissent, Justice Nelson is jousting with windmills of his own making. He relies on Article II, Section 24 of the Montana Constitution, a theory which he admits was not argued by the defendant, and he focuses on the testimony of 911 operator King and Officer Buennemeyer without acknowledging that their testimony, if objectionable, was cumulative since the 911 tape itself was admitted without objection.[6] The dissent proffers a tortured interpretation of this opinion by insinuating that the Court’s definition of “testimonial” encompasses only statements made to government agents. Contrary to the dissent’s mischaracterization, the Court has afforded the defendant greater protection from statements made to a government agent, by presuming that such statements are testimonial.[7] Although the Supreme Court identified three of the “[vjarious formulations of ... ‘testimonial’ statements [that] exist,” it explicitly “[left] for another day any effort to spell out a comprehensive definition of ‘testimonial.’” Crawford, 541 U.S. at 51, 68, 124 S.Ct. at 1364, 1374, 157 L.Ed.2d at 193, 203 (emphasis added). Justice Nelson’s painstaking efforts in “formulating” a comprehensive definition of “testimonial” has led him to simply adopt the formulation proffered to the Court by the National Association of Criminal Defense Lawyers-the broadest of the extant *313 formulations acknowledged by Crawford-despite the Court’s tacit warning against doing so. Finally, Justice Nelson quotes from the Victim Impact Statement submitted by Debra after Mizenko had been tried and convicted. This statement, however, was not submitted until after trial, and has no evidentiary value as to the propriety of admitting Debra’s various statements, nor as to Mizenko’s guilt. Moreover, the Victim Impact Statement, though rhetorically resonant, suffers from the flaws that Justice Nelson decries in the hearsay testimony that was admitted-lack of oath, inability to cross-examine and inability to assess credibility-provides Debra ample opportunity for reflection and fabrication, and represents a premeditated, conscientious attempt to provide testimony.
¶30 Many state courts have considered whether a statement made by the victim of a crime to a friend, family member or acquaintance and describing the crime, identifying the perpetrator or both, is testimonial. Despite Justice Nelson’s disagreement, extant authority supports the Court’s position that such statements, even if made to a loose acquaintance, are nontestimonial unless the declarant had clear reason to believe that they will be used prosecutorially. See, e.g., Salt Lake City v. Williams (Utah Ct. App. 2005), 2005 UT App 493, ¶ 24 (statements by the deceased victim to a friend identifying the perpetrator by name and indicating that he had threatened to kill her held nontestimonial because they were issued “with no reasonable expectation that it would be used in a later legal proceeding”); State v. Kemp (Mo. Ct. App. 2005), 2005 WL 2977790 at *4 (statements by the victim to her neighbor, whose home she had gone to in seeking assistance, that her boyfriend had been holding her hostage at gunpoint held nontestimonial “[e]ven under the broadest reading of Crawford”)-, Wallace v. State (Ind. Ct. App. 2005), 836 N.E.2d 985, 996 (statements by murder victim identifying his killer in response to questions posed by an unknown civilian, EMT, and a nurse held nontestimonial because not taken “‘in significant part... with an eye towards trial’” (citation omitted)); Bray v. Commonwealth (Ky. 2005) 177 S.W.3d 741, 746, 2005 WL 2317014 at *3 (statements by murder victim to her sister indicating that she was afraid for her life and that defendant was outside of her home held nontestimonial even under Crawford’s third and broadest formulation); Foley v. State (Miss. 2005), 914 So.2d 677, ¶ 11 (statements by sexual assault victim to examining physician indicating that defendant forced her to perform oral sex and other sexual acts held nontestimonial); Commonwealth v. Gonsalves (Mass. 2005), 833 N.E.2d 549, 559-62 (assault victim’s response to questioning by her mother stating that her boyfriend had constricted her breathing and hit her held *314 nontestimonial; a reasonable person in the victim’s position would not “anticipate the statement’s being used [prosecutorially]”; the mother’s purpose for procuring the statements “was to understand what had happened, not to establish a basis for prosecution”); Flores v. State (Tex. Ct. App. 2005), 170 S.W.3d 722 (statements by infant victim’s mother to defendant’s sister indicating that defendant had hit their infant held nontestimonial; statements were made within hours after the child had died); State v. Krasky (Minn. Ct. App. 2005), 696 N.W.2d 816, 819-20 (statements made by victim of sexual assault to a nurse practitioner describing the assault held nontestimonial under the “third and broadest formulation” provided in Crawford because “the examination was conducted, at least in part, for the purpose of medical diagnosis”); People v. Rincon (Cal. Ct. App. 2005), 28 Cal.Rptr.3d 844, 858 (statements by victim to former gang-member indicating that he had been shot in the ankle during a gun battle at a particular location held nontestimonial because the victim “could not reasonably have anticipated” prosecutorial use of his statements); State v. Wilkinson (Vt. 2005), 879 A.2d 445, ¶ 10 (statements by victim to defendant’s cousin indicating that defendant had pulled a gun on him and that he thought the defendant was going to kill him held nontestimonial; statements were “made to an individual who had no relationship to the prosecution” and not in the presence of police); Herrera-Vega v. State (Fla. Dist. Ct. App. 2004), 888 So.2d 66 (statement by victim to her parents describing how defendant sexually abused her held nontestimonial); State v. Staten (S.C. Ct. App. 2005), 610 S.E.2d 823, 836 (statements by murder victim, made a day prior to his murder, to his cousin indicating that the defendant had pulled a gun on him held nontestimonial under any of Crawford’s formulations); State v. Blackstock (N.C. Ct. App. 2004), 598 S.E.2d 412, 420 (statements by hospitalized murder victim made to his daughter and wife before he died, describing in detail the armed robbery that culminated with the victim’s being shot, held nontestimonial because “it is unlikely that [the victim] made the statements under a reasonable belief that they would later be used prosecutorially’); State v. Walker (Wash. Ct. App. 2005), 118 P.3d 935, ¶¶ 34-35 (statements by victim of sexual assault describing the incident, identifying the perpetrator and given in response to questioning by her mother held nontestimonial; “the exchange between [mother] and [daughter] was that of a conversation between a concerned parent and an upset child, nothing more”); State v. Moses (Wash. Ct. App. 2005), 119 P.3d 906, ¶ 22 (statements by victim of domestic abuse made to a treating physician and describing the beating and identifying the perpetrator held nontestimonial because *315 victim did not have “reason to believe that her statements to Dr. Appleton would be used at a subsequent trial”). After an exhaustive review of cases applying Crawford, we could find only two instances when a court held that a victim’s statement to a private individual is testimonial. See In re E.H. (Ill. Ct. App. 2005), 823 N.E.2d 1029, 1037 (statements, made by child victim of sexual assault to her grandmother, describing the sexual abuse perpetrated by defendant held testimonial because the statements concern “the fault and identity” of the perpetrator); In re T.T. (Ill. Ct. App. 2004), 815 N.E.2d 789, 804 (statements made by victim of sexual assault to a treating physician that explain how she was physically injured and the pain she experienced held nontestimonial; however, her statements identifying the defendant as the perpetrator held testimonial).
¶31 The dissent, in arguing that Crawford has eradicated the excited utterance exception to hearsay in criminal cases, paints with too broad a brush. Although Crawford does disallow the use of hearsay exceptions based on indicia of reliability as the basis to admit hearsay statements, it does so only in the context of testimonial statements which violate the Sixth Amendment right to confront witnesses. Crawford does not expressly or impliedly supersede the rules of evidence as they relate to nontestimonial evidence. See Crawford, 541 U.S. at 68, 124 S.Ct. at 1374, 158 L.Ed.2d at 203 (“[wjhere nontestimonial hearsay is at issue, it is wholly consistent with the Framers’ design to afford the States flexibility in their development of hearsay law-as does Roberts, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether”). In the wake of Crawford, nontestimonial hearsay is analyzed pursuant to the Roberts reliability standard, or simply to ensure compliance with the rules of evidence. See Mosteller, 39 U. Rich. L. Rev. at 617, 619 (“[presently, lower courts should still apply the ‘old system’ to non-testimonial hearsay because Crawford did not overrule Roberts in this area”); see also Agostini v. Felton (1997), 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.E.2d 391, 423 (quoting Rodriguez de Quijas v. Shearson/Am. Express, Inc. (1989), 490 U.S. 477, 484,109 S.Ct. 1917, 1921-22, 104 L.E.2d 526) (‘“[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions’”). Rather than divine the dramatic and unexpressed implications of Crawford, we will afford the Supreme Court the first opportunity to expressly overrule Roberts and to invalidate the Federal Rules of Evidence pertaining to hearsay in criminal cases, as is their express preference.
*316 ¶32 As the Sixth Circuit has recognized, Crawford dealt only with testimonial statements and did not disturb the rule that nontestimonial statements are constitutionally admissible if they fit within a firmly rooted hearsay exception or they bear independent guarantees of trustworthiness. Gibson, 409 F.3d at 338.
¶33 We thus turn to the question of whether Debra’s statement fits within a firmly rooted exception to the hearsay rule. Rule 803, M.R.Evid. (Availability of declarant immaterial), enumerates the exceptions to the hearsay rule in Montana. Subsection 2 of the Rule sets forth the “excited utterance” exception. In Matter of S.M., 2001 MT 11, 304 Mont. 102, 19 P.3d 213, a child had seen her mother’s abusive boyfriend outside of a building and subsequently told a social worker that she was frightened. Matter of S.M., ¶ 19. We found that the social worker’s testimony relaying the child’s statement was properly admitted as an excited utterance relating to the startling event of seeing her abuser. Matter of S.M., ¶ 24. We noted that the social worker observed the child tightly grasping her foster mother’s arm “with a very frightened look in her eyes.” Matter of S.M., ¶ 20. Presumably, we relied on this observation of the child’s appearance to support our unstated conclusion that the child remained “under the stress of excitement” when she expressed her fear. In State v. Hamby, 1999 MT 319, 297 Mont. 274, 992 P.2d 1266, we concluded that hearsay statements were properly admitted under the excited utterance exception because “[t]he record does not suggest that [the victim’s] distress subsided once Betty asked her questions, even when they were in the bathroom.” Hamby, ¶ 29; see also State v. Graves (1995), 272 Mont. 451, 454, 458-59, 901 P.2d 549, 551, 554-55 (indicating that a rape victim’s statements to an anonymous 911 caller made “shortly after defendant left” her home and while she was still crying qualified as an excited utterance); State v. Cameron, 2005 MT 32, 326 Mont. 51, 106 P.3d 1189 (holding that a victim’s sobbing statement to her sister related to a sexual assault that had occurred one or two hours earlier was an excited utterance under Rule 803(2), M.R.Evid.). It is clear from the cases cited above that a declarant’s appearance and demeanor can indicate that the declarant remains under the stress of excitement caused by a startling event and a lapse of time is not determinative of whether that stress has subsided.
¶34 In the present case, Debra’s statements to Grove were made a short time after the assault while she was out of breath, visibly upset and had a fresh wound on her face. Since Debra’s statements, made while she was still under stress caused by the event, clearly fall within the firmly rooted excited utterance exception to hearsay under Rule 803(2), M.R.Evid., the court did not err in admitting them.
*317 ¶35 Affirmed.
CHIEF JUSTICE GRAY, JUSTICES WARNER, MORRIS and RICE.

 If testimonial, we would consider whether the State made a showing that Debra was unavailable at trial and that Mizenko had an opportunity to cross-examine Debra at the time she made the statements, as required to overcome a Sixth Amendment Confrontation Clause objection.

 Professor Mosteller similarly identifies the other possible purpose of the Confrontation Clause as “protect[ing] the defendant from malicious falsehoods or even errors by the witness independent of governmental manipulation.” Mosteller, 39 U. Rich. L. Rev. at 571.

 We note that this approach, in addition to being relatively easy to apply, approximates that proposed by Professor Mosteller, whereby different burdens apply depending on whom the declarant speaks to: the defendant must show that a statement made to a private individual was clearly or exclusively intended to be testimonial; or the prosecution must show that a statement made to a government agent was intended by the declarant only for a non-testimonial purpose and that the government agent who received the statement was not producing a statement to be used prosecutorially. See Mosteller, 39 U. Rich. L. Rev. at 572, 624. We favor an “objective reason to believe” standard over Professor Mosteller’s proposed “declarant’s intent” standard because of the practical difficulty of divining the intentions of an absent declarant except by reference to what they have reason to believe (i.e., what they should reasonably expect).

 Justices Coats and Kourlis specially concurred, but they agreed, without further elaboration, that the victim’s statements were not testimonial. Compan, 121 P.3d at 886.

 Incidentally, the victim had made an appointment with the district attorney to formally recant her accusation, but did not show up for the appointment. Compan, 121 P.3d at 878.

 Arguably, Grove’s testimony was also cumulative insofar as it asserts any wrongdoing by Mizenko. Debra told Grove only that he husband had been drinking and was trying to hurt her. The 911 recording, however, includes statements that Mizenko had hit Debra, pulled out her hair and pushed her to the ground. Certainly, such acts constitute attempts to hurt Debra. Accordingly, the only additional statement to Grove is that Mizenko had been drinking-no crime for a person such as Mizenko who has obtained the age of majority.

 The dissent likewise mischaracterizes our method for determining whether a statement is testimonial as “a beliefknowledge/purpose” test. While we do identify the declarant’s potentially suspect motivation as being of concern to the drafters of the Sixth Amendment, we have announced a test that depends on the declarant’s reasonable expectation at the time a statement is made.