DA 06-0052

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 27

STATE OF MONTANA,

        Plaintiff and Appellee,

   v.

RAUL C. SANCHEZ,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Twentieth Judicial District,
In and For the County of Sanders, Cause No. DC 04-39
Honorable C.B. McNeil, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

           Chad Wright and David Avery (argued), Appellate Defender
Office, Helena, Montana

      For Appellee:

           Honorable Mike McGrath, Attorney General; C. Mark Fowler (argued),
Assistant Attorney General, Helena, Montana

           Robert Zimmerman, County Attorney, Thompson Falls, Montana

Heard:  May 7, 2007
Submitted:  June 5, 2007
Decided:  January 31, 2008

Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1     Raul C. Sanchez (Sanchez) appeals from his conviction in the Twentieth Judicial District, Sanders County, of deliberate homicide. We affirm.

¶2     We restate the issues as follows:

¶3     Did the District Court improperly allow Aleasha's statements to be introduced over Sanchez's hearsay objections?

¶4     Did the introduction of Aleasha's note violate Sanchez's Sixth Amendment right to confrontation?

¶5     Did the prosecutor's closing argument deny Sanchez the right to a fair trial?

¶6     Did the "lesser included offense" language of the mitigated deliberate homicide instruction impermissibly allow the jury to consider sentencing in reaching its verdict?

## BACKGROUND

¶7     Sanchez shot and killed Aleasha Chenowith (Aleasha) outside her home on the night of July 19, 2004. Later that evening, Sanchez turned himself in to law enforcement and admitted shooting Aleasha. The State charged Sanchez with deliberate homicide for Aleasha's death.

¶8     Before trial, Sanchez moved to exclude a note the State proposed to offer as a trial exhibit. The note read:

> To whom it concerns:
>
> On July 8, 04 around 10:30 p [sic] Raul Sanchez Cardines told me if I ever was cought [sic] with another man while I was dating him, that he would kill me. Raul told me he had friends in Mexico that had medicine that would kill me and our doctors wouldn't know what it was till it was to [sic] late and I would be dead.

2

So if I unexspetly [sic] become sick and on the edge of death, and perhaps I die no [sic] you will have some answers.

Aleasha Chenowith (written and printed signature)

¶9 Sanchez argued that the note should be excluded because it contained inadmissible multiple hearsay and would also violate his Sixth Amendment right to confrontation. The District Court denied Sanchez's motion and ruled that Aleasha's note was admissible as a statement under belief of impending death, pursuant to M. R. Evid. 804(b)(2). The District Court concluded that Sanchez's statements within the note were admissible as either a statement against interest, pursuant to M. R. Evid. 804(b)(3), or as a statement describing Sanchez's then existing state of mind, pursuant to M. R. Evid. 803(3). The District Court did not address Sanchez's Confrontation Clause claim. Sanchez's jury trial began on June 13, 2005.

¶10 At trial, Sanchez testified that he and Aleasha had been dating for approximately four-and-a-half months and that he had contemplated marrying Aleasha. However, Sanchez became suspicious that Aleasha was cheating on him with Angel, one of Sanchez's co-workers. On July 19, 2004, Sanchez confronted Angel, who confirmed Sanchez's suspicions. Sanchez testified that when he later spoke with Aleasha, she threatened to create problems for him with law enforcement so that Sanchez would ultimately have his children taken away from him. According to Sanchez, he felt as though "something got dark in [his] head[,]" and he shot Aleasha several times.

¶11 At trial, the State introduced several statements that Aleasha made to others before her death. In addition to the note, the State elicited testimony about other instances in

3

which Sanchez purportedly threatened Aleasha. Pamela Ehrlich testified that Aleasha told her about an argument she had with Sanchez. According to Ehrlich's testimony, during the argument Sanchez stated, "Me love you, [Aleasha]. Me not love you that much. You cross me, I kill you." The District Court overruled Sanchez's hearsay objection. Leann Chenowith, Aleasha's sister, testified that Aleasha told her that "if [Aleasha] ever made [Sanchez] mad . . . he had stuff in Mexico that his friend could give him, and that it would eat her stomach in a matter of days." This statement was also admitted over Sanchez's hearsay objection.

¶12 During closing arguments, the prosecutor argued that the jury could convict Sanchez of mitigated deliberate homicide only if the jury found that Sanchez's *response* to extreme emotional distress was reasonable, rather than that his *explanation* for the extreme emotional distress was reasonable. Defense counsel objected that the prosecutor was misinterpreting the jury instructions, and the District Court overruled the objection.

¶13 Sanchez objected throughout the proceedings to the mitigated deliberate homicide jury instruction because the instruction stated that mitigated deliberate homicide was a "lesser included offense" of deliberate homicide. Sanchez argued that the instruction allowed the jurors to indirectly consider sentencing factors in their deliberations. The District Court overruled Sanchez's objection.

¶14 The jury convicted Sanchez of deliberate homicide, and the District Court sentenced Sanchez to life without parole in Montana State Prison. Sanchez appeals his conviction.

4

## STANDARD OF REVIEW

¶15 We review a district court's evidentiary rulings for abuse of discretion. *State v. Mizenko*, 2006 MT 11, ¶ 8, 330 Mont. 299, ¶ 8, 127 P.3d 458, ¶ 8. A court abuses its discretion when it acts arbitrarily, without employing conscientious judgment, or exceeds the bounds of reason, resulting in substantial injustice. *State v. Weldele*, 2003 MT 117, ¶ 72, 315 Mont. 452, ¶ 72, 69 P.3d 1162, ¶ 72. We review de novo a district court's interpretation of the Sixth Amendment. *Mizenko*, ¶ 8. In criminal cases, we review jury instructions in their entirety to determine if they fully and fairly presented the applicable law to the jury. *State v. Detonancour*, 2001 MT 213, ¶ 57, 306 Mont. 389, ¶ 57, 34 P.3d 487, ¶ 57.

## DISCUSSION

¶16 **I    Did the District Court improperly allow Aleasha's statements to be introduced over Sanchez's hearsay objections?**

¶17 "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted" within the statement. M. R. Evid. 801(c). Hearsay is inadmissible "except as otherwise provided by statute, these rules [of evidence], or other rules applicable in the courts of this state." M. R. Evid. 802. Sanchez asserts that the District Court erred when it admitted, over hearsay objections, Aleasha's statements to her sister, Aleasha's statements to her neighbor, and Aleasha's note. According to Sanchez, these three statements contain double hearsay and thus, to be admissible, must comply with the multiple-hearsay rule, which requires that all instances of hearsay within a statement

5

conform to a hearsay exception. M. R. Evid. 805. We note at the outset that these three statements contain only one level of hearsay. Montana Rule of Evidence 801(d)(2) provides:

> Statements which are not hearsay. A statement is not hearsay if: . . . (2) Admission by party-opponent. The statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity . . . .

(Paragraph breaks omitted.) Thus, the statements attributable to Sanchez are exempt from the hearsay definition; they are not hearsay.

*A. Aleasha's statement to her sister*

¶18 Leann Chenowith testified that Aleasha told her that Sanchez had threatened that "if [Aleasha] ever made [Sanchez] mad . . . he had stuff in Mexico that his friend could give him, and that it would eat her stomach in a matter of days." The District Court overruled Sanchez's hearsay objection without stating a specific rationale. Sanchez argues that no hearsay exception applies to this statement and that the District Court erred in admitting the statement.

¶19 We conclude that the District Court correctly overruled Sanchez's hearsay objection to Leann Chenowith's testimony because the statement falls outside the hearsay definition. Though Aleasha made the statement outside the courtroom, the record reveals no indication that the State sought to prove that Sanchez actually could obtain poison from acquaintances in Mexico. The State may have offered the statement to show a pattern of threats or that Sanchez contemplated killing Aleasha; however, these rationales are not objectionable on hearsay grounds. The District Court correctly overruled

6

Sanchez's hearsay objection because the State did not offer the statement to prove the truth of the matter asserted, and thus, the statement was not hearsay.

*B. Aleasha's statement to her neighbor*

¶20    Pamela Ehrlich testified that Aleasha told her that, during an argument, Sanchez stated, "[m]e love you, [Aleasha].  Me not love you that much.  You cross me, I kill you." The District Court again overruled Sanchez's hearsay objection without stating a specific rationale.  Sanchez argues that no hearsay exception applies to this statement and that the District Court erred in admitting the statement.  The State apparently combines its arguments relating to the statements of Aleasha's neighbor and Aleasha's sister and responds that Aleasha's statements could be admissible as excited utterances, present sense impressions, or statements made under a belief of impending death.  Alternatively, the State argues that if the District Court erred its error was harmless.

¶21    Our review of the record convinces us that the hearsay exceptions proposed by the State are inapplicable to this statement.  The "present sense impression" hearsay exception applies to statements made "while the declarant was perceiving the event or condition, or immediately thereafter."  M. R. Evid. 803(1).  Ehrlich's testimony reveals that Aleasha's statement recounted a threat Sanchez made the prior evening.  Thus, Aleasha's statement described an event that she "perceived" the prior evening, rather than a "present sense impression."  The "excited utterance" hearsay exception applies to statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."  M. R. Evid. 803(2).  Ehrlich testified that Aleasha seemed unconcerned by Sanchez's threat and that Aleasha

7

remarked, "[Sanchez] was nothing more than a dumb little Mexican. He ain't got the balls to do nothing." Aleasha's comments indicate that she lacked the "stress of excitement" necessary to implicate the excited utterance exception. Similarly, we conclude that the "statement under belief of impending death" hearsay exception is inapplicable because Aleasha's comments indicate that she did not make the statement "while believing that [her] death was imminent," and her statement did not concern "the cause or circumstance of what [she] believed to be impending death." M. R. Evid. 804(b)(2).

¶22 Though no exceptions apply to Aleasha's hearsay statement, we agree with the State that the District Court committed harmless error because the State presented other admissible evidence that proved the same facts as the hearsay evidence. We apply the "cumulative evidence" test to determine whether a district court's trial error is harmless. *State v. Van Kirk*, 2001 MT 184, ¶ 43, 306 Mont. 215, ¶ 43, 32 P.3d 735, ¶ 43. Under the "cumulative evidence" test, we consider a trial error harmless if the State demonstrates that the "fact-finder was presented with admissible evidence that proved the same facts as the tainted evidence and, qualitatively, by comparison, the tainted evidence would not have contributed to the conviction." *Van Kirk*, ¶ 47. In *Van Kirk*, we abandoned the "overwhelming evidence" test, which emphasized the quantity of admissible evidence proving guilt, in favor of the "cumulative evidence" test, which focuses on the qualitative impact the inadmissible evidence may have on the fact-finder. *Van Kirk*, ¶ 43.

¶23 Sanchez testified that his suspicions of Aleasha's infidelity were confirmed on Monday morning, July 19, 2004, when Angel, a co-worker, admitted sleeping with

8

Aleasha. Sanchez testified that he then arranged for his daughters to sleep at a friend's house so that he and Aleasha could talk without his children present. He testified that he bagged up Aleasha's clothes and dropped them off at her house. He knocked on the door, but no one answered, and Sanchez returned to work. Sanchez testified that he recognized a vehicle outside Aleasha's house as he drove home from work and that he knew that Angel was at Aleasha's house. Sanchez testified that he retrieved his pistol from his home, went to a store and bought ammunition, and then returned to Aleasha's house. Again, no one answered the door, and Sanchez went home. When Aleasha called him that evening and asked him to come to her house, he returned to Aleasha's and parked outside her house, with the gun on the seat next to him. He testified that she came outside, they argued, and he grabbed his gun and shot her when she threatened to have his children removed from his care.

¶24 Jason Sheehan, one of Sanchez's co-workers, testified that Sanchez mentioned during the lunch break that Sanchez was upset because Aleasha had cheated on him. Sheehan testified that Sanchez stated that he was going to go to Aleasha's house, drop off her clothes, and "maybe slap her around a little bit." Sheehan also testified that Sanchez stated that "maybe he would get out his 9 [millimeter pistol] and go shoot her." At no point did Sanchez object to Sheehan's testimony.

¶25 In light of the damaging testimony from Sheehan and Sanchez, we conclude that the District Court committed harmless error in admitting Aleasha's hearsay statement. The testimony of Sanchez and Sheehan presented the jury with cumulative evidence that proved the same facts as Aleasha's statement. Moreover, given the character of

9

Sanchez's and Sheehan's in-court testimony, the jury was presented with evidence of deliberate homicide that qualitatively outweighed any impact that Aleasha's statement may have had on the jury. The jury heard from Aleasha's killer himself, that, after learning of Aleasha's infidelity, he made arrangements for the care of his children, he went to the store and purchased ammunition, he took the loaded gun to Aleasha's house, he waited for her to come outside, and he shot her after a brief argument. We conclude that the qualitative nature of Sanchez's testimony outweighs any qualitative impact that Aleasha's hearsay statement may have had on the jury and that no reasonable possibility exists that the hearsay statement contributed to the conviction, and thus, any error is harmless. *Van Kirk*, ¶ 47.

*C. Aleasha's note*

¶26 At trial, the State offered a note written by Aleasha that stated:

> To whom it concerns:
>
> On July 8, 04 around 10:30 p [sic] Raul Sanchez Cardines told me if I ever was cought [sic] with another man while I was dating him, that he would kill me. Raul told me he had friends in Mexico that had medicine that would kill me and our doctors wouldn't know what it was till it was to [sic] late and I would be dead.
>
> So if I unexspetly [sic] become sick and on the edge of death, and perhaps I die no [sic] you will have some answers.
>
> Aleasha Chenowith (written and printed signature)

Sanchez objected to the note's admission on hearsay grounds throughout the pre-trial proceedings and at trial. The District Court overruled Sanchez's hearsay objection and concluded that M. R. Evid. 804(b)(2), the hearsay exception for statements made under

10

belief of impending death, removed Aleasha's written statements from the hearsay rule. Sanchez argues that Aleasha's note does not indicate that she feared imminent death, and thus, the District Court erred in admitting the note as a dying declaration.

¶27 We agree with Sanchez that the District Court incorrectly relied on the "statement under belief of impending death" hearsay exception to admit Aleasha's note. This exception applies to statements "made by a declarant while believing that the declarant's death was imminent, concerning the cause or circumstance of what the declarant believed to be impending death." M. R. Evid. 804(b)(2). Aleasha's statements that "*if* I [unexpectedly] become sick" and "*perhaps* I die" indicate that she viewed her death as neither certain nor imminent. (Emphases added.)

¶28 However, as with Ehrlich's testimony, we conclude that the District Court's ruling constituted harmless error. As discussed in ¶ 19, the statements relating to Sanchez's Mexico connections fall outside the hearsay definition because the State did not offer the statements to prove that Sanchez actually could obtain poison from sources in Mexico. Sanchez's threat that he would kill Aleasha if she committed adultery presents the only questionable portion of Aleasha's note. The threat's substance essentially mirrors Sanchez's "[y]ou cross me, I kill you" statement, and we conclude that this statement's admission constitutes harmless error for the same reasons.

¶29 The testimony of Sheehan and Sanchez presented the jury with cumulative evidence that proved the same facts that Aleasha's note sought to prove. Further the qualitative nature of their testimony outweighs any qualitative impact that Aleasha's hearsay statement may have had on the jury; we can conceive of no evidence more

11

qualitatively damning than Sanchez's narration of the day he killed Aleasha. Further, Sheehan's account of Sanchez's lunchtime comment that "maybe he would get out his 9 and go shoot [Aleasha]" confirmed that Sanchez contemplated killing Aleasha shortly after learning of her transgression. In light of the evidence presented by Sanchez's and Sheehan's testimony, we conclude that no reasonable possibility exists that the statement in the note contributed to Sanchez's conviction, and thus, any error is harmless. *Van Kirk*, ¶ 47.

¶30 **II Did the introduction of Aleasha's note violate Sanchez's Sixth Amendment right to confrontation?**

¶31 Sanchez claims that the District Court violated his constitutional right to confrontation under both the United States and Montana Constitutions when it admitted Aleasha's note as evidence. Sanchez argues that the note was "testimonial" hearsay and thus was inadmissible unless the court found (1) that the declarant was unavailable, and (2) that there was a prior opportunity for cross-examination. Though Sanchez concedes Aleasha's unavailability, he asserts that he had no opportunity to question her about the note.

¶32 The Sixth Amendment of the United States Constitution, applicable to the States through the Fourteenth Amendment, guarantees criminal defendants the right to be confronted with the witnesses against them. The Sixth Amendment's Confrontation Clause applies only to testimonial hearsay. *Davis v. Washington*, ___ U.S. ___, 126 S. Ct. 2266, 2274-75 (2006). Testimonial hearsay statements are inadmissible unless the declarant is "unavailable" for trial and the defendant had a prior opportunity for cross-

12

examination. *Crawford v. Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 1374 (2004). The Supreme Court emphasized in *Crawford* that the Sixth Amendment mandates that a testimonial statement's reliability be tested "in the crucible of cross-examination[,]" not left to the "vagaries of the rules of evidence . . . ." *Crawford*, 541 U.S. at 61, 124 S. Ct. at 1370. Additionally, Montana's Constitution grants a defendant the right to "meet the witnesses against him face to face . . . ." Mont. Const. art. II, § 24. This provision clarifies that full cross-examination is a critical aspect of the confrontation right. *State v. Clark*, 1998 MT 221 ¶ 22, 290 Mont. 479, ¶ 22, 964 P.2d 766, ¶ 22.

¶33 Sanchez argues that Aleasha's note, documenting the date and time of Sanchez's alleged statement and the substance of his threat, is testimonial because it bears similarities to an affidavit. Additionally, Sanchez equates Aleasha's note with Lord Cobham's infamous letter, discussed by the Supreme Court in *Crawford*, that implicated Sir Walter Raleigh for treason. 541 U.S. at 44-45, 124 S. Ct. at 1360. The State argues that the note is non-testimonial because it reflects "an intent to direct attention (possibly only medical attention) to the reasons for any suspicious illness."

¶34 Though the United States Supreme Court has declined to comprehensively define "testimonial," it has supplied a consistent starting point:

> [The Confrontation Clause] applies to "witnesses" against the accused—in other words, those who "bear testimony." [1] N. Webster, An American Dictionary of the English Language (1828). "Testimony," in turn, is typically "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Ibid.* An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.

*Crawford*, 541 U.S. at 51, 124 S. Ct. at 1364; *see also Davis*, ___ U.S. at ___, 126 S. Ct. at 2274. Thus, to determine whether a witness bears testimony, the Court finds significant the statement's purpose, the statement's context, and the audience the statement is intended to reach. In *Davis*, the Court seemingly retreated from its earlier pronouncements that "statements taken by police officers in the course of interrogations are . . . testimonial under even a narrow standard" and that "[w]hatever else the term [testimonial] covers, it applies at a minimum to . . . police interrogations." *Crawford*, 541 U.S. at 52, 68, 124 S. Ct. at 1364, 1374. The *Davis* Court concluded that whether or not a statement made to police officers during an interrogation is testimonial hinges on the interrogation's primary purpose: if the interrogation's primary purpose is to "establish or prove past events potentially relevant to later criminal prosecution[,]" the statement is testimonial; if the interrogation's primary purpose is to "enable police assistance to meet an ongoing emergency[,]" the statement is non-testimonial. *Davis*, ___ U.S. at ___, 126 S. Ct. at 2273-74. As the Supreme Court's reasoning in *Davis* illustrates, the Court finds no particular inquiry dispositive in determining whether a statement is testimonial.

¶35    In *State v. Mizenko*, we discussed what constitutes a testimonial statement. In general, a declarant's statements are presumed testimonial if they are knowingly made to a police officer or government agent. *Mizenko*, ¶ 23. A statement is presumed non-testimonial, however, if the declarant had "objective reason to believe" that the statement served only "to avert or mitigate an imminent or immediate danger" and the agent receiving the statement lacked intent to create evidence. *Mizenko*, ¶ 23. A statement made to a non-governmental agent is non-testimonial unless the declarant had "clear

14

reason to believe that the statement would be used in court as substantive evidence against the defendant . . . ." *Mizenko*, ¶ 23. Thus, though we declined to formulate a comprehensive definition of "testimonial," we recognized that certain presumptions arise depending on the intended audience and the purpose of the statement.

¶36 In our *Mizenko* discussion we also found significant a statement's context, and we looked to whether a declarant reasonably should expect that the State would use the declarant's statements at trial. *Mizenko*, ¶¶ 17-21. We noted the Supreme Court's characterization of "a casual remark to an acquaintance" as non-testimonial, *Crawford*, 541 U.S. at 51, 124 S. Ct. at 1364, and we explained that the word "'casual' . . . modifies the declarant's assumption as to what use, if any, the listener might make of the statement." *Mizenko*, ¶ 17. If an objective declarant reasonably would expect the State to use the declarant's statements at trial, then, absent an opportunity for confrontation, the Sixth Amendment bars the admissibility of such statements. *Mizenko*, ¶ 17. Further, we recognized that a statement's characterization as testimonial did not depend on government involvement in the declarant's making the statement: "'Thus, if just before trial a person shoved a written statement under the courthouse door, asserting that the accused did in fact commit the crime, that would plainly be testimonial even though no government official played a role in preparing the statement.'" *Mizenko*, ¶ 19 (quoting Richard D. Friedman, *The Confrontation Clause Re-Rooted and Transformed*, 2004 Cato Sup. Ct. Rev. 439, 458).

¶37 Aleasha addressed her note "[t]o whom it concerns[.]" Her stated reason for writing the note was that "if I unexspetly [sic] become sick and on the edge of death, and

15

perhaps I die no [sic] you will have some answers." The note's substance indicates that the note's purpose was to explain her untimely death or poisoning, not to prevent or mitigate future harm. Aleasha's short note named the person she suspected would kill her and the method he threatened to use. In essence, Aleasha's note contained information that could establish or prove facts to answer questions regarding how, why, and by whom she had been harmed or killed. The State's contention that the purpose of Aleasha's note may have been to "direct attention (possibly only medical attention) to the reasons for any suspicious illness[,]" completely ignores the accusatory nature of the note (as does Justice Rice's concurrence): in a nine-line note, Aleasha documented the date and time that Sanchez threatened her, she named Sanchez as her suspected killer, she described Sanchez's motive, and she described his threatened method of execution. Though Aleasha did not address her note specifically to police officers, the note's substance and its comprehensive salutation indicate that it reasonably included law enforcement.

¶38    Moreover, the circumstances surrounding Aleasha's note indicate that it bears little similarity to a non-testimonial "casual remark to an acquaintance." *Crawford*, 541 U.S. at 51, 124 S. Ct. at 1364. Rather, the circumstances indicate that an objective declarant would reasonably expect the State to make use of her statement: Aleasha memorialized Sanchez's threat by writing it down on a piece of paper from a yellow legal pad; she used a formal salutation on the note: "[t]o whom it concerns:"; the note asserted that Sanchez had already committed a crime—threatening Aleasha; the note asserted that Sanchez contemplated a future crime—killing Aleasha; and she formally ended her note

16

by both printing and signing her name. Additionally, though Aleasha did not "shove a written statement under the courthouse door," she did leave the note in a location that an officer investigating her death could easily find it; the officer testified that he found the note on Aleasha's kitchen counter with her bills and correspondence. *Mizenko*, ¶ 19. We conclude that Aleasha's note was testimonial because the purpose of the note was to explain Aleasha's untimely death or poisoning, the intended audience reasonably included law enforcement, and the circumstances surrounding the note indicate that an objective declarant reasonably should have anticipated that the State would make use of the statements at trial. Our conclusion that Aleasha's note was testimonial, however, does not end our analysis.[1]

---

[1] In his concurrence, Justice Rice relies on *State v. Spencer*, 2007 MT 245, 339 Mont. 227, 169 P.3d 384, for the proposition that we should consider the "primary purpose" of Aleasha's note itself to determine whether the note constitutes a testimonial statement. The concurrence misreads *Spencer*.

In *Spencer*, we determined that a three-and-a-half-year-old victim's statements were non-testimonial after determining that the witnesses testifying about the statements had heard the statements in their capacities as a foster parent and a counselor, rather than as state investigators. *Spencer*, ¶ 23. Because the statements were made to non-governmental agents, the statements were presumed non-testimonial unless the declarant had "clear reason to believe" that they would be used against the defendant in court. *Mizenko*, ¶ 23. We concluded, however, that the "clear reason to believe" standard was unworkable when applied to a three-and-a-half-year-old victim and, relying on the United States Supreme Court's *Davis* decision, we looked to the "primary purpose" of the interaction between the declarant and the witnesses because the circumstances surrounding the statements bore similarities to an interrogation. *Spencer*, ¶ 22.

Here, in contrast to *Spencer*, the declarant, Aleasha, was a competent adult and the circumstances bear no similarities to an interrogation. Even if the circumstances were akin to an interrogation, the proper focus would be on the primary purpose of the interrogation or interaction, not, as the concurrence suggests, on the primary purpose of the statement itself. Moreover, though we concluded in *Spencer* that the declarant's age made the *Mizenko* presumptions unworkable, those presumptions were nonetheless

17

¶39    Though the Supreme Court held in *Crawford* that the Confrontation Clause mandates cross-examination to assess a testimonial statement's reliability, the Court nonetheless acknowledged that exceptions to the Confrontation Clause exist. *Crawford*, 541 U.S. at 62, 124 S. Ct. at 1370. The Court cited the forfeiture by wrongdoing doctrine as one such exception: "the rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds; it does not purport to be an alternative means of determining reliability." *Crawford*, 541 U.S. at 62, 124 S. Ct. at 1370. In *Davis*, the Court again referenced the equitable doctrine, stating that "one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." *Davis*, ___ U.S. at ___, 126 S. Ct. at 2280.

¶40    As this case presents our first opportunity to consider the forfeiture by wrongdoing doctrine since the *Crawford* decision, other jurisdictions' post-*Crawford* decisions aid our analysis. To the extent that it applies to an admitted and intentional killing, we find persuasive the Sixth Circuit's reasoning in *U.S. v. Garcia-Meza*, 403 F.3d 364 (6th Cir. 2005). In *Garcia-Meza*, a jury convicted the defendant of murdering his wife after hearing testimony from law enforcement officers describing the wife's hearsay statements concerning a prior assault. At trial, the defendant admitted killing his wife, but argued that her murder was not premeditated. *Garcia-Meza*, 403 F.3d at 367. On appeal, Garcia-Meza claimed that his right to confrontation was violated when his wife's hearsay statements were admitted into evidence. *Garcia-Meza*, 403 F.3d at 369. The

---

initially implicated and necessitated the "primary purpose" analysis; no presumptions are implicated in this case. For these reasons, *Spencer* is not applicable to the present case.

18

Sixth Circuit disagreed and held that Garcia-Meza had forfeited his right to confrontation because his wrongdoing caused her unavailability. *Garcia-Meza*, 403 F.3d at 370 (citing *Crawford*, 541 U.S. at 62, 124 S. Ct. at 1370; *Reynolds v. U.S.*, 98 U.S. 145, 158-59, 25 L. Ed. 244, 248 (1879) ("The rule has its foundation in the maxim that no one shall be permitted to take advantage of his own wrong.")). The Sixth Circuit noted that no dispute existed as to whether the defendant killed his wife; the dispute centered, rather, on whether the defendant acted with premeditation. Thus, the court reasoned, because the defendant was responsible for the declarant's unavailability, he forfeited his right to confrontation. *Garcia-Meza*, 403 F.3d at 370.

¶41 The Sixth Circuit specifically rejected Garcia-Meza's argument that the forfeiture doctrine applies only when the defendant has committed wrongdoing with the intent to prevent the witness from testifying. *Garcia-Meza*, 403 F.3d at 370. The court stated that the Supreme Court's affirmation of the forfeiture doctrine's equitable basis "strongly suggests that the rule's applicability does not hinge on the wrongdoer's motive." *Garcia-Meza*, 403 F.3d at 370. The court further reasoned that a defendant would benefit if his wrongdoing prevented a witness from testifying against him, regardless of whether or not that was his intent. The Sixth Circuit held that the rule of forfeiture, based on equitable principles, permits no such result. *Garcia-Meza*, 403 F.3d at 370-71.

¶42 The Sixth Circuit decided *Garcia-Meza* in the interim between the United States Supreme Court's *Crawford* and *Davis* decisions. In *Davis*, the Supreme Court further clarified the forfeiture by wrongdoing doctrine. In response to the contention that domestic violence cases require more flexibility regarding testimonial evidence, the

19

Court reiterated that the doctrine operates to extinguish "confrontation claims on essentially equitable grounds." *Davis*, ___ U.S. at ___, 126 S. Ct. at 2280 (citations omitted). The Court noted that domestic violence crimes are particularly prone to victim intimidation and coercion to prevent the victim from testifying, and it stated that:

> [W]hen defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce. While defendants have no duty to assist the State in proving their guilt, they *do* have the duty to refrain from acting in ways that destroy the integrity of the criminal-trial system.

*Davis*, ___ U.S. at ___, 126 S. Ct. at 2279-80. The Court further stated that Federal Rule of Evidence 804(b)(6) codifies the forfeiture doctrine. Though primarily dicta, the *Davis* discussion of the forfeiture doctrine and the Court's statement that Rule 804(b)(6) "codifies" the doctrine has generally been interpreted by lower courts to require a defendant's intent to silence a witness by wrongdoing before applying the doctrine. *E.g. Colorado v. Moreno*, 160 P.3d 242, 245-46 (Colo. 2007) (collecting cases and noting that "the clear consensus in non-murder cases is that the doctrine requires a showing of an intent on the part of the defendant to prevent the declarant from testifying at trial.").

¶43 Though the Supreme Court's discussion of the forfeiture doctrine in *Davis* seemingly casts doubt on the Sixth Circuit's reasoning in *Garcia-Meza*, other jurisdictions' post-*Davis* decisions concur with the Sixth Circuit that, in homicide cases, the doctrine's applicability does not depend on whether the defendant intended to silence a witness. For example, in *California v. Giles*, a murder case, the California Supreme Court held that an "intent-to-silence" element is not a prerequisite to the forfeiture doctrine's applicability. 152 P.3d 433, 443 (Cal. 2007), *cert. granted*, ___ U.S. ___,

20

2008 WL 109701 (Jan. 11, 2008). The defendant in *Giles* admitted killing his girlfriend, but argued that he acted in self-defense. The California Supreme Court adopted its appellate court's reasoning that "[f]orfeiture is a logical extension of the equitable principle that no person should benefit from his own wrongful acts." *Giles*, 152 P.3d at 443. The court further reasoned that, regardless of whether a defendant specifically intended to prevent a witness from testifying, "[a] defendant whose intentional criminal act renders a witness unavailable for trial benefits from his crime if he can use the witness's unavailability to exclude damaging hearsay statements by the witness that would otherwise be admissible." *Giles*, 152 P.3d at 443.

¶44 The California Supreme Court rejected the defendant's argument that language from *Davis* discussing the forfeiture doctrine—"'when defendants *seek* to undermine the judicial process by procuring or coercing silence from witnesses and victims'"— supported an intent-to-silence requirement. *Giles*, 152 P.3d at 443 n. 5 (quoting *Davis*, ___ U.S. at ___, 126 S. Ct. at 2280). Rather, the court stated that the Supreme Court simply was describing traditional witness tampering cases in a domestic violence context. *Giles*, 152 P.3d at 443 n. 5. The California court considered it more significant that the Supreme Court reaffirmed the forfeiture doctrine's equitable nature and clarified that *Crawford* did not destroy a court's ability to protect the integrity of its proceedings. *Giles*, 152 P.3d at 443 n. 5. The *Giles* court concluded that applying the forfeiture doctrine without an intent-to-silence requirement was proper to protect the integrity of a court's proceeding: "courts should be able to further the truth-seeking function of the

21

adversary process when necessary, allowing fact finders access to relevant evidence that the defendant caused not to be available through live testimony." *Giles*, 152 P.3d at 444.

¶45    Even jurisdictions that impose an intent-to-silence requirement on the forfeiture by wrongdoing doctrine recognize that homicide cases may present an exception.    For example, in *Illinois v. Stechly*, the Illinois Supreme Court left open the possibility of a homicide exception though it determined that the above-quoted language from *Davis* "strongly connotes a requirement of intent." 870 N.E.2d 333, 350-53 (Ill. 2007) (plurality).    The *Stechly* court declined to apply the forfeiture doctrine to a sexual abuse case, absent evidence showing that the defendant intended to prevent the witness from testifying, and noted that outside the context of murder cases, the authorities uniformly require proof of intent.[2]  *Stechly*, 870 N.E.2d at 353 (plurality).    The court distinguished the majority of cases, which hold that intent is irrelevant, as either predating *Davis* or as involving the defendant's murdering the witness.    *Stechly*, 870 N.E.2d at 351-52 (plurality).    The Illinois court further noted that jurisdictions that did not impose an intent-to-silence requirement in murder cases feasibly were reconcilable with the general rule requiring intent.   Summarizing the reasoning of those cases, the Illinois court stated that those jurisdictions essentially hold that:

> [T]he prosecution need not *prove* that the defendant committed murder with
> the intent of procuring the victim's absence. This is consistent with
> presuming such intent when the wrongdoing at issue is murder. When a

---

[2]Recent holdings of the California Supreme Court in *Giles* and the Washington Supreme Court in *Washington v. Mason*, 162 P.3d 396 (Wash. 2007) challenge the *Stechly* plurality's claim.  Though both the California and Washington cases involved homicide cases, the courts' holdings that the applicability of the forfeiture doctrine required no intent-to-silence were not limited to homicide cases.

defendant commits murder, notwithstanding any protestation that he did not specifically intend to procure the victim's inability to testify at a subsequent trial, he will nonetheless be sure that this would be a result of his actions. Murder is, in this sense, different from any other wrongdoing in which a defendant could engage with respect to a witness—more than a possibility, or a substantial likelihood, a defendant knows with absolute certainty that a murder victim will not be available to testify.

*Stechly*, 870 N.E.2d at 352-53 (plurality). Thus, the Illinois court left open the possibility that the intent to prevent a witness's testimony could be "presumed" in the murder context, while otherwise requiring proof of intent. *Stechly*, 870 N.E.2d at 352-53 (plurality).

¶46 To the extent that a deliberate criminal act results in the victim's death, we agree that the forfeiture by wrongdoing doctrine does not hinge on whether the defendant specifically intended to silence a witness. The doctrine derives from the maxim that no person should benefit from the person's own wrongdoing. *Reynolds v. U.S.*, 98 U.S. at 158-59, 25 L. Ed. at 248; *Garcia-Meza*, 403 F.3d at 370. The natural result of a deliberate killing is *always* that the victim is unavailable to testify; we agree with the *Giles* court that a defendant whose intentional criminal act results in a victim-declarant's death benefits from the defendant's wrongdoing if the defendant can use the death to exclude the victim-declarant's otherwise admissible testimony, regardless of whether the defendant specifically intended to silence the victim-declarant. *Giles*, 152 P.3d at 443. Such a result undermines the judicial process and threatens the integrity of court proceedings, and though courts may not "vitiate constitutional guarantees when they have the effect of allowing the guilty to go free[,]" nor must they acquiesce in the destruction of the criminal-trial system's integrity. *Davis*, ___ U.S. at ___, 126 S. Ct. at 2280.

23

¶47 The facts of this case are substantially similar to those of *Garcia-Meza*. Sanchez fatally shot Aleasha, thereby rendering her unavailable as a witness. Sanchez was charged with Aleasha's homicide, and the State introduced her prior statements. No dispute exists as to whether Sanchez killed Aleasha—he admitted it to law enforcement and at trial. We need not determine whether the defendant's wrongdoing is the same act for which he was tried because the dispute at trial centered on whether mitigating circumstances existed, not on whether Sanchez killed Aleasha. We conclude that Sanchez forfeited his Sixth Amendment right to confront Aleasha when he killed her. Moreover, Sanchez cannot claim that his Montana constitutional right to "meet the witnesses against him face to face" was violated when his admittedly deliberate wrongdoing prevented such a confrontation. We emphasize the narrow holding on this issue: when a defendant admittedly and deliberately kills another person, thus procuring the person's unavailability as a witness, the defendant forfeits the constitutional rights to confront the victim at trial.[3] Whether the doctrine of forfeiture by wrongdoing applies to situations in which the defendant disputes the underlying act of "wrongdoing" or to situations in which the wrongdoing does not result in death are issues not presented or addressed in this case.

---

[3]In his special concurrence, Justice Nelson concludes that the Court errs by adopting the reasoning of the California court in *Giles*. Lest anyone be confused, there is a difference between discussing an opinion from a sister state and "adopting" that court's reasoning. We do not adopt *Giles*. Rather, our holding is heavily qualified: the wrongdoing must be deliberate, it must be criminal, and it must result in the victim/declarant's death. Despite the concurrence's protestations to the contrary, our holding does not amount to a "broad sweeping statement" as to the applicability of the forfeiture doctrine.

¶48 Though the District Court failed to address Sanchez's Confrontation Clause claim and based its ruling on hearsay exceptions, we cannot say the District Court reached an incorrect result. We will uphold a district court's correct decision, regardless of the stated rationale. *State v. Rensvold*, 2006 MT 146, ¶ 34, 332 Mont. 392, ¶ 34, 139 P.3d 154, ¶ 34. We conclude the District Court reached the legally correct result.

¶49 **III     Did the prosecutor's closing argument deny Sanchez the right to a fair trial?**

¶50 Sanchez asserts that the prosecutor engaged in misconduct by repeatedly misstating the law regarding the elements of mitigated deliberate homicide during closing arguments and that these misstatements denied Sanchez his right to a fair trial. The State maintains that Sanchez has waived his right to appeal this issue because he failed to move the District Court for curative measures, such as a mistrial or a cautionary instruction. As Sanchez points out, however, his objection was overruled, and he had no reason to anticipate that the District Court would issue curative measures. We conclude that Sanchez's objection during closing arguments properly preserved this issue for appeal. Section 46-20-104, MCA.

¶51 If a prosecutor's improper comments prejudice a defendant's right to a fair trial, then the proper remedy is reversal. *State v. Stringer*, 271 Mont. 367, 381, 897 P.2d 1063, 1072 (1995). Though Sanchez did not move the District Court for a mistrial based on prosecutorial misconduct, we employ the same two-step analysis we use to review a denial of such a motion: we determine first whether the prosecutor made improper

comments, and, if so, whether the comments prejudiced the defendant's right to a fair and impartial trial. *State v. Gladue*, 1999 MT 1, ¶ 12, 293 Mont. 1, ¶ 12, 972 P.2d 827, ¶ 12.

*A. The prosecutor's comments during closing argument*

¶52  Sanchez argues that the prosecutor repeatedly misstated the law regarding mitigated deliberate homicide during the State's closing argument and rebuttal. Specifically, Sanchez points to the prosecutor's statement that, to convict for mitigated deliberate homicide, the jury had to find that Sanchez's *response* to extreme emotional distress was reasonable, rather than that a reasonable explanation existed for his emotional distress. The prosecutor then argued:

> [t]he streets would be littered with corpses if it was reasonable to shoot somebody because they cheated on you and made you angry. Based on your own lifetime experiences you have seen that. You may have been part of it. Did you kill somebody? Did somebody kill you, your friends, other people? No. That answers the question. This is not a *reasonable response* for a person under these circumstances.

(Emphasis added.)  Sanchez argues that the plain language of the mitigated deliberate homicide statute indicates that "reasonable" modifies the defendant's emotional state, not the defendant's actions. The statute provides that a person who commits a deliberate homicide, "but does so under the influence of extreme mental or emotional stress for which there is reasonable explanation or excuse" has committed mitigated deliberate homicide. Section 45-5-103(1), MCA. The statute is unambiguous, and we conclude that the prosecutor misstated the law.

¶53  On appeal, the State argues that the prosecutor's remarks are "troubling" only because they are not presented in their proper context. The State then attempts to furnish

this context by directing us to two instances when the prosecutor made "accurate" statements of the law. The first instance the State identifies is an accurate statement of the law; however, the State has misidentified the speaker: it was Sanchez's counsel, not the prosecutor who properly stated the law on mitigated deliberate homicide. The second instance, though properly attributed to the prosecutor and an accurate statement of the law, was followed directly by an incorrect explanation:

> The reasonableness of the explanation or excuse must be determined from the viewpoint of a reasonable person in the actor's situation. That is, *what would a reasonable person do,* not what the defendant did. The evidence in this case shows you it was not reasonable. And if it's not reasonable, there goes mitigated deliberate homicide.

(Emphasis added.)

¶54 The State maintains that improvising during closing arguments frequently results in imperfect syntax and less than crystal clear meaning. The comments at issue, however, demonstrate a blatant misstatement of the law, not mere inadvertence. The prosecutor's improper closing argument went far beyond appropriate ad-libbing and tested the boundaries of professional ethics. We cannot accept the State's incongruous arguments in support of the prosecutor's statements, and we conclude that the prosecutor's statements were improper.

*B. Prejudicial effect of improper comments*

¶55 Having determined that the prosecutor improperly stated the law, we must next determine whether the comments prejudiced Sanchez's right to a fair and impartial trial. *Gladue*, ¶ 12. We do not presume that a prosecutor's improper comments prejudiced a defendant's right to a fair and impartial trial; rather, Sanchez must demonstrate, from the

record, that the prosecutor's misstatements prejudiced him. *Gladue*, ¶ 27. Additionally, when determining prejudicial effect, we review improper comments in the context of the entire case. *Gladue*, ¶ 27.

¶56 Sanchez offers as evidence of prejudicial effect a note from the jury to the District Court requesting additional instructions. The note reads: "Your Honor, One of our jurors has requested that you define the term 'reasonable.'" Sanchez argues that the jury's note indicates that the jury was confused by the term "reasonable," that the prosecutor's improper comments caused this confusion, and that Sanchez's right to a fair trial was thus prejudiced.

¶57 The jury's note requested only that the District Court define "reasonable." The note did not indicate that the jury was confused as to which term "reasonable" modified. Moreover, the jury instruction on mitigated deliberate homicide accurately conveyed § 45-5-103, MCA, which unambiguously states that "reasonable" modifies the explanation for the extreme mental or emotional stress, not the defendant's act of causing the death of another human being. The jury additionally was presented with defense counsel's correct interpretation of the law and the District Court's instructions on mitigated deliberate homicide. The prosecutor also informed the jury that the attorneys' closing arguments were not evidence. Before closing arguments the District Court read aloud the jury instructions and stated that the instructions "constitute[d] the law that [the jury] must follow in this case." American jurisprudence depends on a jury's ability to follow instructions and juries are presumed to follow the law that courts provide. *State v.*

*Turner*, 262 Mont. 39, 55, 864 P.2d 235, 245 (1993); *Opper v. U.S.*, 348 U.S. 84, 95, 75 S. Ct. 158, 165 (1954).

¶58   Based on the lack of ambiguity in the mitigated deliberate homicide instruction, the District Court's oral and written instructions to the jury, and the presumption that the jury followed the law, we conclude that Sanchez has failed to demonstrate that the prosecutor's improper comments prejudiced his right to a fair and impartial trial.

¶59   **IV     Did the "lesser included offense" language of the mitigated deliberate homicide instruction impermissibly allow the jury to consider sentencing in reaching its verdict?**

¶60   Sanchez claims that the jury instruction defining mitigated deliberate homicide as a "lesser included offense of Deliberate Homicide" improperly allowed the jury to consider sentencing in reaching its verdict. Sanchez asserts that this language "*probably* pushed the jurors away from fully considering [his] mitigated deliberate homicide defense." (Emphasis added.) Sanchez argues that including the word "lesser" in the instruction may have permitted the jury to surmise that Sanchez would receive a lesser sentence if the jury convicted him of mitigated deliberate homicide rather than of deliberate homicide.

¶61   A jury should not consider sentencing in determining a defendant's guilt or innocence. *State v. Brodniak*, 221 Mont. 212, 226-27, 718 P.2d 322, 332 (1986) (citations omitted). We recognized in *Brodniak* that a verdict form containing the terms misdemeanor and felony could permit a jury indirectly to consider a defendant's punishment. *Brodniak*, 221 Mont. at 226-27, 718 P.2d at 332. We review jury

29

instructions in criminal cases in their entirety to determine if they fully and fairly presented the applicable law to the jury. *State v. Detonancour*, 2001 MT 213, ¶ 57, 306 Mont. 389, ¶ 57, 34 P.3d 487, ¶ 57. District courts have broad discretion when instructing juries, and reversible error occurs only if the jury instructions prejudiced the defendant's substantial rights. *State v. Strauss*, 2003 MT 195, ¶ 47, 317 Mont. 1, ¶ 47, 74 P.3d 1052, ¶ 47.

¶62 The District Court provided the jury a mitigated deliberate homicide instruction that closely parallels § 45-5-103, MCA, the statute defining mitigated deliberate homicide. The jury instruction correctly stated the law. Additionally, the jury instructions, taken together, accurately set forth the State's burden of proof and the elements that the jury must find to convict Sanchez of mitigated deliberate homicide or deliberate homicide. To give a jury instruction on mitigated deliberate homicide that would alleviate Sanchez's concern would be difficult, if not impossible. If, as Sanchez argues, use of the word "lesser" invited the jury to indirectly consider punishment, the same can be said of the word "mitigated"—a term defining the very essence of the described offense. The jury instructions, when viewed in their entirety, fully and fairly presented the applicable law to the jury. Moreover, Sanchez's speculation that the "lesser included" language *probably* dissuaded the jury from a mitigated deliberate homicide verdict cannot overcome the presumption that the jury actually followed the law that the District Court provided. *Turner*, 262 Mont. at 55, 864 P.2d at 245. We conclude that the District Court properly instructed the jury.

¶63    Affirmed.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ BRIAN MORRIS

Justice Jim Rice specially concurs.

¶64    I agree with the Court's conclusion to affirm the District Court's judgment on Issues I-IV. However, I disagree with the Court's analysis under Issues IB, IC, and II, and would affirm under alternate reasoning.

## Issue I

¶65    The Court determines that Aleasha's statement to her neighbor (Issue IB) and Aleasha's note (Issue IC) are hearsay to which no hearsay exception applies, but that the District Court's admission of this evidence constituted "harmless error" for which we need not reverse. Opinion, ¶ 28. While I agree with the outcome of the Court's decision, I write separately to urge the adoption of the forfeiture by wrongdoing exception to the hearsay rules.

¶66    Forfeiture by wrongdoing, as this Court accepts, is an equitable concept that prevents an individual from benefiting from his own wrongful actions. Opinion, ¶ 47. In fact, Montana law generally codifies the equitable principle in § 1-3-208, MCA (2005), which states that "[n]o one can take advantage of his own wrong." While the Montana Rules of Evidence are silent regarding the forfeiture doctrine's relation to hearsay, the

principle has been codified in the Federal Rules of Evidence as Rule 804(b)(6). This rule provides that: "A statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness" is not considered hearsay.[4]

¶67 The United States Supreme Court first applied the doctrine of forfeiture by wrongdoing in *Reynolds v. United States*, 98 U.S. 145, 158 (1878):

> The Constitution does not guarantee an accused person against the legitimate consequences of his own wrongful acts. . . . [I]f [a defendant] voluntarily keeps the witnesses away, he cannot insist on his [Sixth Amendment] privilege. If, therefore, when absent by his procurement, their evidence is supplied in some lawful way, he is in no condition to assert that his constitutional rights have been violated.

The Supreme Court recently affirmed the doctrine's validity in *Crawford v. Washington*, 541 U.S. 36, 62, 124 S. Ct. 1354, 1370 (2004) ("the rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds"). It has been adopted by numerous state courts as well. After recently considering both the evidentiary and constitutional aspects of the issue, the Supreme Judicial Court of Massachusetts noted that "we are aware of no jurisdiction that, after considering the doctrine, has rejected it." *Commonwealth v. Edwards*, 830 N.E.2d 158, 166-67 (Mass. 2005). Even after acknowledging that its state constitution provides broader protections

---

[4]The dissenting opinion states that the adoption of the forfeiture by wrongdoing exception within the Federal Rules of Evidence is not "a principled ground" for considering adoption of the exception for our state rules. Dissent, ¶ 123 n. 5. I confess an inability to understand why consideration of the approach taken by the federal rules—and indeed, the approach of many other states who have likewise adopted the exception—on an evidentiary issue is unprincipled. Nor does adoption of the exception eliminate all considerations of trustworthiness.

than the federal constitution, the Massachusetts Court interpreted its state constitution "coextensively" with the federal constitution on this issue and recognized the doctrine, "[g]iven the overwhelming precedential and policy support for its adoption[.]" *Edwards*, 830 N.E.2d at 168.

¶68 I would apply this principle to the Rules of Evidence as well. However, despite a previous opportunity to do so, the Court has so far declined. We were presented with proposed M. R. Evid. 804(b)(6), the forfeiture by wrongdoing exception to M. R. Evid. 802's bar against admission of hearsay, following a recent rule review process. Support for the adoption was offered by various members of the Commission on Evidence and by district court judges, but the Court rejected the rule. I continue to believe that the rule would serve an appropriate and important purpose in the search for truth which our courts are intended to conduct. The instant case presents a clear example of how a defendant may benefit from his wrongdoing and why the exception should be adopted. Accordingly, the Court's holding, which applies the forfeiture doctrine as an exception to the Confrontation Clause, should apply with equal force as an exception to the rule against hearsay, which would admit the evidence at issue here.

Issue II

¶69 The Court concludes that Aleasha's note was testimonial because "the purpose of the note was to explain Aleasha's untimely death or poisoning, the intended audience reasonably included law enforcement, and the circumstances surrounding the note indicate that an objective declarant reasonably should have anticipated that the State would make use of the statements at trial." Opinion, ¶ 38. I cannot agree with any of

33

these conclusions because the Court has added its own speculation, or has ignored parts of the note, to reach each one.

¶70 First, the Court states that the "note's substance indicates that the note's purpose was to explain her untimely death or poisoning . . . ." Opinion, ¶ 37. However, the Court does not adequately consider that the note gave instruction in the event Aleasha unexpectedly would "become sick and on the edge of death." In such a sickened state, Aleasha would benefit by giving her medical providers the "answers" she was providing in the note. The Court simply pretends these words do not exist. The State's argument to this effect is improperly dismissed by the Court.

¶71 Then, the Court concludes that the note was "intended" for law enforcement because it was left in the *kitchen*. Opinion, ¶ 38. This conclusion is based upon the Court's surmise that law enforcement could more easily find it there. Assigning an intention by Aleasha to involve law enforcement from this most ordinary of actions is mere speculation. I submit that the note would have been found by law enforcement in any room of the house, and its location in the kitchen, without more, added nothing to the note's testimonial significance. Indeed, when the "more" is considered, which is virtually ignored by the Court, a contrary conclusion appears. The note was handwritten on a small, single piece of paper and was found in Aleasha's kitchen among her personal correspondence and bills. The location of the note in Aleasha's *personal* home, among *personal* papers, supports the objective conclusion that the note had a *personal* purpose and was meant for those who would have been typical visitors to her kitchen. Aleasha made no effort whatsoever to put her message into the hands of officials, to otherwise

34

take precautions to protect or preserve the message for legal purposes, or to even label or direct the note to law enforcement.

¶72 While the Court states that it "finds no particular inquiry dispostive in determining whether a statement is testimonial[,]" Opinion, ¶ 34, the Court's analysis implies the question is susceptible to short, simplistic solutions: first, that because the note was more than a "casual remark," it must be testimonial, and because the note was discovered by a police officer, it must have been intended for police to easily find it. Opinion, ¶ 38. This ignores the further details of the note and the surrounding circumstances.

¶73 When determining if a statement made by an unavailable declarant is testimonial, two Montana cases guide us: *State v. Mizenko* and *State v. Spencer*. In *State v. Mizenko*, we offered initial, post-*Crawford* boundaries of testimonial and non-testimonial statements for purposes of the Confrontation Clause. 2006 MT 11, 330 Mont. 299, 127 P.3d 458. We concluded that statements are testimonial in at least two situations: (1) "when a declarant knowingly speaks to a police officer or governmental agent" and (2) when the declarant had a "clear reason to believe that the statement would be used in court as substantive evidence against the defendant . . . ." *Mizenko*, ¶ 23. In contrast, we explained that a statement is non-testimonial when the declarant has an "objective reason to believe" that the statement will serve to "avert or mitigate an imminent or immediate danger . . . ." *Mizenko*, ¶ 23. We also stated that the "clear reason to believe" standard is an "objective" standard. *Mizenko*, ¶ 23 n. 3.

¶74 In *State v. Spencer*, we elaborated on *Mizenko*, concluding that where the "clear reason to believe" standard is "unworkable," we must review the statement to determine

35

its "primary purpose." 2007 MT 245, ¶ 22, 339 Mont. 227, ¶ 22, 169 P.3d 384, ¶ 22. There, we relied on the Supreme Court's decision in *Davis v. Washington*, 547 U.S. ___, 126 S. Ct. 2266 (2006). *Spencer*, ¶¶ 22-23. In *Davis*, the Supreme Court decided that when circumstances objectively indicate that the primary purpose of an interrogation is to enable police to assist in an ongoing emergency, the statements are non-testimonial. *Davis*, 547 U.S. at ___, 126 S. Ct. at 2273. If however, the circumstances objectively signify that an ongoing emergency does not exist, but rather the interrogation's purpose is to prove past events that may be relevant in a future prosecution, the statements are testimonial. *Davis*, 547 U.S. at ___, 126 S. Ct. at 2273-74. Accordingly, when determining, for Confrontation Clause purposes, whether a statement is testimonial, we first consider whether it is objectively reasonable that the declarant intended the statement to be used as evidence against the accused and, second, where there is no clear reason to believe that the declarant intended the statement to be used as evidence, we consider the primary purpose of the statement.

¶75 When considering the note in its entirety under these standards, Aleasha may just as well have intended the note to alert medical providers to the cause of a potential illness, a non-testimonial purpose, or, indeed, simply have offered an explanation to others about the reason for her demise. The salutation "[t]o whom it concerns[,]" just as "reasonably" includes medical or emergency personnel, relatives, and friends, thereby mitigating the note's potential testimonial qualities. The Court ascribes a law enforcement purpose from this broad salutation because it necessarily includes law enforcement. Instead, the Court should infer otherwise: because the generic salutation

36

potentially included anyone in the world, it was not primarily a directive to law enforcement.

¶76 Even assuming that the Court's reasoning about Aleasha's note and the reasoning of this concurrence offer competing, objectively reasonable interpretations regarding Aleasha's intent, it would then be appropriate to consider, as in *Davis* and *Spencer*, the "primary purpose" of the note to determine whether it constitutes testimonial or non-testimonial evidence. Here the Court limits the application of our holding in *Spencer* to only interrogations, Opinion, ¶ 38 n. 1, thereby disregarding the very reason we adopted the primary purpose test in the first place. We adopted the primary purpose analysis because the "clear reason to believe" standard was unworkable as applied to the statement of a three-and-a-half-year-old child. *Spencer*, ¶ 22. Accordingly, application of the primary purpose analysis does not turn solely on whether an interrogation is involved, but considers whether the clear reason to believe standard is unworkable under the circumstances. However, in an effort to avoid consideration of the primary purpose of the note, the Court narrowly constricts the kinds of circumstances in which the primary purpose analysis can be applied—only to interrogations—and deflates our holding in *Spencer*. This is an artificial and shortsighted tact which will not serve us well in the future. To the contrary, the primary purpose analysis should be applicable to any statement, including a hand-written note, where it is unclear whether the declarant intended the statement to be used as evidence. Accordingly, where there are competing objectively reasonable interpretations of a statement, as here, we should look to the

37

statement's primary purpose and "based on objective circumstances" determine whether the statement is testimonial. *Spencer*, ¶ 22.

¶77    Pursuant to our holding in *Spencer*, where the primary purpose of the statement is to assist in future litigation, the statement is deemed testimonial. *Spencer*, ¶ 22. However, where the primary purpose is to mitigate future harm, the statement is non-testimonial. *Spencer*, ¶ 22. In analyzing the primary purpose we must consider the totality of the "objective circumstances." *Spencer*, ¶ 22. Unfortunately, the Court's opinion considers only a fraction of the note. Looking at the note as a whole, most of the note discusses the availability of a drug which could possibly cause Aleasha's sickness or death. The note's third sentence states: "So, if I unexspetly [sic] become sick and on the edge of death, and perhaps I die no [sic] you will have some answers." The conclusory word "so" indicates that the note's purpose is to provide "answers" if Aleasha contracted a serious illness which could bring about her death. The note indicates the cause of her potential sickness (a drug from Mexico that doctors may not know about), and also suggests investigatory leads (Sanchez or his friends) that may be helpful in ascertaining either the type of drug for medical purposes or assigning criminal responsibility—an admittedly testimonial aspect of the note. However, looking at the note in its entirety, and the circumstances surrounding Aleasha's handling of the note, discussed above, it served largely to alert family, friends, or medical personnel to the reasons she came down with a sudden and strange illness. Consequently, the note's <u>primary</u> purpose was not to serve as evidence in a criminal prosecution, but to mitigate potential harm.

¶78   Thus, I would conclude that there is neither a "reasonably objective" reason to believe that the note was intended for criminal prosecution purposes, nor circumstances supporting a conclusion that the note was "primarily" written to support a prosecution. Accordingly, while I support adoption of the forfeiture by wrongdoing exception for Confrontation Clause purposes, I believe that the note is non-testimonial and would end the Confrontation Clause analysis at that point.

/S/ JIM RICE

Justice John Warner concurs.

¶79   Along with Justice Rice, I concur with the Court's conclusion to affirm the judgment.

¶80   I am constrained to reserve judgment on the wisdom of incorporating the forfeiture by wrongdoing hearsay exception into the Rules of Evidence. If such an amendment to the Rules is again proposed, I will consider arguments both for and against its adoption.

¶81   I must agree with Justice Rice's analysis concerning the note left by Aleasha. It was not testimonial for the reasons he states in his concurrence. This is especially true in view of the fact that the note was not introduced to prove that Sanchez killed Aleasha, but for the sole purpose of providing relevant evidence concerning whether he did so while acting under the influence of extreme mental or emotional stress.

/S/ JOHN WARNER

Justice James C. Nelson, dissenting.

¶82 Although I agree with much of the Court's analysis under Issue III, I conclude that the prosecutor's misstatements of the law during closing arguments and the District Court's explicit endorsement of those misstatements prejudiced Sanchez's rights to due process and a fair trial under Article II, Sections 17 and 24 of the Montana Constitution. Accordingly, I conclude that this case should be reversed and remanded for a new trial, and I dissent from the Court's contrary decision.

¶83 Given this conclusion, a discussion of Issues I, II, and IV is, arguably, unnecessary. Nevertheless, given the importance of the Court's holdings under Issue II, I write separately to explain my agreement and disagreement with certain points in the Court's analysis. As for Issues I and IV, I agree with the Court's resolution of these two issues; however, I write separately to express my disagreement with the approach proposed by Justice Rice's concurrence for resolving Issue I. I first address Issue III, followed by Issue II and, lastly, Issue I.

### Issue III

¶84 The role of the prosecutor is unique within the criminal justice system. It is not simply a specialized version of the duty of any attorney not to overstep the bounds of permissible advocacy. *See State ex rel. Fletcher v. District Court*, 260 Mont. 410, 415, 859 P.2d 992, 995 (1993). Rather, as the Supreme Court explained long ago:

> The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and

40

vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 633 (1935). Accordingly, the prosecutor is required to "execute the duties of his representative office diligently and fairly, avoiding even the appearance of impropriety that might reflect poorly on the state." *Fletcher*, 260 Mont. at 415, 859 P.2d at 995 (citation and internal quotation marks omitted). Though he "must diligently discharge the duty of prosecuting individuals accused of criminal conduct, the prosecutor may not seek victory at the expense of the defendant's constitutional rights." *Fletcher*, 260 Mont. at 415, 859 P.2d at 995 (citation and internal quotation marks omitted). Indeed, the prosecutor "is obligated to respect the defendant's right to a fair and impartial trial in compliance with due process of law." *Fletcher*, 260 Mont. at 415, 859 P.2d at 995 (citation and internal quotation marks omitted). Simply stated, "a prosecutor should seek justice and not simply an indictment or a conviction." *Fletcher*, 260 Mont. at 415, 859 P.2d at 995 (citing *Preston v. State*, 615 P.2d 594, 601 (Alaska 1980)).

¶85 With these well-settled principles in mind, I agree with the Court's preliminary analysis under Issue III. In particular, I agree with the Court that § 45-5-103(1), MCA, is unambiguous. Opinion, ¶ 52. Section 45-5-103(1), MCA, provides:

> A person commits the offense of mitigated deliberate homicide when the person purposely or knowingly causes the death of another human being but does so under the influence of extreme mental or emotional stress *for which there is reasonable explanation or excuse*. The *reasonableness of the explanation or excuse* must be determined from the viewpoint of a reasonable person in the actor's situation. [Emphases added.]

41

Under the plain language of this statute, the word "reasonable" modifies the defendant's explanation or excuse for his emotional state, not the defendant's actions. The statute requires the fact-finder to determine whether the defendant's explanation or excuse for his extreme mental or emotional stress is reasonable. There is nothing in the statute that requires (or even permits) the jury to determine whether the defendant's *response* to the extreme mental or emotional stress was reasonable.

¶86 I also agree with the Court that the prosecutor's improper closing arguments went far beyond appropriate ad-libbing and that his comments demonstrate a blatant misstatement of § 45-5-103(1), MCA. Opinion, ¶ 54. Indeed, the prosecutor told the jurors—not once, but *four* times, and even after defense counsel had pointed out that the prosecutor was misstating the law—that they had to determine whether Sanchez's *actions* were reasonable. First, the prosecutor argued during his initial closing:

> The defense counsel will argue that this was a *reasonable response* to extreme emotional distress. You must ask yourself, is it reasonable? Was there extreme -- extreme emotional distress? Not just emotional distress but extreme emotional distress and *was his reaction reasonable*. You can argue until you're blue in the face and you cannot make this defendant's *actions reasonable* under these circumstances.[5] [Emphases added.]

Then, during his rebuttal closing, the prosecutor reiterated these misstatements of the law several more times:

---

[5] Not only did the prosecutor misrepresent the law here, he also misrepresented to the jury what defense counsel would argue. Defense counsel argued the reasonableness of Sanchez's explanation or excuse for his claimed extreme mental or emotional stress, not the reasonableness of Sanchez's actions under the circumstances.

The Court read you the instructions. The reasonableness of the explanation or excuse must be determined from the viewpoint of a reasonable person in the actor's situation. *That is, what would a reasonable person do, not what the defendant did.* The evidence in this case shows you it was not reasonable. And if it's not reasonable, there goes mitigated deliberate homicide.

. . . .

Defense counsel said this is an extremely difficult case. I would make no comment on that but I will suggest to you, based on your lifetime experiences, *was the defendant's actions reasonable* under these circumstances? Your lifetime experiences tell you that relationships come and go, that people get cheated on in their mind, that they are hurt, that they are angry. If it is *reasonable* then under those circumstances *to kill somebody*, the streets would be littered with corpses. [Emphases added.]

At this point, defense counsel objected that the prosecutor "is misinterpreting these instructions over and over again." The court responded: "You may continue with closing. The objection is overruled." The prosecutor then stated, yet again:

The streets would be littered with corpses if it was *reasonable to shoot somebody* because they cheated on you and made you angry. Based on your own lifetime experiences you have seen that. You may have been part of it. Did you kill somebody? Did somebody kill you, your friends, other people? No. That answers the question. This is not a *reasonable response* for a person under these circumstances. [Emphases added.]

¶87 While the Court concludes that these improper statements "tested the boundaries of professional ethics," Opinion, ¶ 54, I conclude that the prosecutor crossed those boundaries. Rule 3.1(a)(1) of the Montana Rules of Professional Conduct provides that "[a] lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein . . . without having first determined through diligent investigation that there is a bona fide basis in law and fact for the position to be advocated" (paragraph break omitted). Likewise, Rule 3.3(a)(1) prohibits a lawyer from "knowingly . . . mak[ing] a false statement of . . . law to a tribunal or fail[ing] to correct a false statement of . . . law

43

previously made to the tribunal by the lawyer" (paragraph break omitted). And Rule 4.1(a) prohibits a lawyer from "knowingly . . . mak[ing] a false statement of . . . law to a third person" (paragraph break omitted).

¶88 Here, there is no legal basis for the version of § 45-5-103(1), MCA, argued by the prosecutor during closing arguments. The prosecutor's statements of the law were patently false.[6] Moreover, as the Court observes, the prosecutor's comments were not mere inadvertence. Opinion, ¶ 54. As a matter of fact, if we accept that the prosecutor followed his duty under Rule 3.1(a)(1) not to advocate a position "without having first determined through diligent investigation that there is a bona fide basis in law" for that position, then the inference readily drawn from the record before us is that the prosecutor knowingly made false statements of law in violation of Rules 3.3(a)(1) and 4.1(a).

¶89 But it is not necessary to draw such an inference. The proposed jury instruction filed by the prosecutor with respect to the issue of mitigated deliberate homicide establishes that he was fully aware of the law under § 45-5-103(1), MCA. That proposed instruction states:

---

[6] Although the State makes no attempt to show that the prosecutor correctly stated the law, the State does argue that the prosecutor's statements were not improper. The State suggests that the prosecutor merely improvised, resulting in "syntax left imperfect and meaning less than crystal clear." However, I agree with the Court that the State's arguments in this regard are incongruous. Opinion, ¶ 54. In fact, the State's candor to this Court is questionable in light of its attempt to spin the prosecutor's misstatements as nothing more than "ambiguous" remarks, "inartfully spoken" and "not exemplars of clarity," but "fair arguments" if not viewed in "distorted isolation." These characterizations are disingenuous at best, given that the prosecutor blatantly misrepresented the law, not once, but four times in his two closing arguments. The State legitimately may argue that Sanchez waived his claim of error or was not prejudiced by the prosecutor's misstatements; but as to those misstatements, the State has an ethical duty to candidly concede obvious prosecutorial misconduct.

> In order to find the Defendant guilty of the lesser offense of mitigated deliberate homicide, the State must prove the following two propositions:
> First, that the Defendant caused the death of Aleasha Chenoweth and
> Second, that when the Defendant did so, he acted purposely or knowingly;
> Additionally, you must find that at the time the Defendant caused the death of Aleasha Chenoweth, he was acting *under the influence of extreme mental or emotional stress for which there is reasonable explanation or excuse.* The reasonableness of such explanation or excuse shall be determined from the viewpoint of a reasonable person in the Defendant's situation. [Emphasis added.]

The emphasized language is identical to the pertinent language of § 45-5-103(1), MCA. In other words, the prosecutor correctly recited the language of the statute in his proposed jury instruction but went to the jury and argued a completely different—and false—version of the statute. Given these circumstances, I conclude that the prosecutor's improper closing arguments did not merely "test[] the boundaries of professional ethics," Opinion, ¶ 54, but instead crossed the boundaries of the Montana Rules of Professional Conduct and violated the prosecutor's duties and responsibilities set out in *Fletcher.*[7]

¶90 The Court holds that although the prosecutor improperly stated the law to the jury, Sanchez has not demonstrated that the prosecutor's misstatements prejudiced his right to a fair and impartial trial. I disagree. The basic premise underlying the Court's holding is that the District Court provided an unambiguous instruction on mitigated deliberate homicide and the jury followed that instruction. *See* Opinion, ¶ 58. In this regard, the

---

[7] In this regard, I note that in *State v. Stewart*, 2000 MT 379, 303 Mont. 507, 16 P.3d 391, we chastised this same prosecutor for misrepresenting the State's burden of proof during voir dire and closing argument. *See Stewart*, ¶¶ 35-45. We stated that although a prosecutor may comment on the burden of proof as it relates to facts presented in trial, he "may not go outside the record or *misrepresent the law as instructed by the judge.*" *Stewart*, ¶ 40 (emphasis added, citation omitted).

Court notes that "juries are presumed to follow the law that courts provide." Opinion, ¶ 57. This presumption is well-established in American jurisprudence, and I do not dispute it. However, I do dispute the Court's assumption that the jury received an unambiguous instruction on mitigated deliberate homicide.

¶91 Prior to closing arguments, the District Court read Instructions 8 through 19. The instruction on mitigated deliberate homicide (Instruction 17) accurately conveyed § 45-5-103(1), MCA, as follows:

> A person commits the offense of Mitigated Deliberate Homicide when the person purposely or knowingly causes the death of another human being but does so under the influence of extreme mental or emotional stress for which there is reasonable explanation or excuse. The reasonableness of the explanation or excuse must be determined from the viewpoint of a reasonable person in the actor's situation.

However, during the prosecutor's rebuttal closing argument, the following sequence of events occurred:

> [THE PROSECUTOR:] Defense counsel said this is an extremely difficult case. I would make no comment on that but I will suggest to you, based on your lifetime experiences, was the defendant's actions reasonable under these circumstances? Your lifetime experiences tell you that relationships come and go, that people get cheated on in their mind, that they are hurt, that they are angry. If it is reasonable then under those circumstances to kill somebody, the streets would be littered with corpses.
> [DEFENSE COUNSEL]: Your Honor, I'm going to have to object because he is misinterpreting these instructions over and over again.
> THE COURT: You may continue with closing. The objection is overruled.

By overruling defense counsel's objection that the prosecutor was misinterpreting the instructions, the District Court effectively endorsed the prosecutor's statement as to what the jury had to decide—namely, whether Sanchez's *actions* were reasonable. Not content

46

to rest on his laurels, however, the prosecutor then proceeded to repeat this misstatement of the law:

> [THE PROSECUTOR]: The streets would be littered with corpses if it was reasonable to shoot somebody because they cheated on you and made you angry. Based on your own lifetime experiences you have seen that. You may have been part of it. Did you kill somebody? Did somebody kill you, your friends, other people? No. That answers the question. This is not a reasonable response for a person under these circumstances. This is not extreme emotional distress. Thank you.

Immediately thereafter, the bailiffs were sworn and the jurors began their deliberations.

¶92    It is apparent on this record that the jury received conflicting instructions from the court on mitigated deliberate homicide. Under Instruction 17, which was given before closing arguments, the jury was told to decide whether Sanchez, at the time he caused Aleasha's death, was under the influence of extreme mental or emotional stress for which there was reasonable explanation or excuse. But under the version of the law provided by the prosecutor near the end of his rebuttal closing argument, the jury was told to decide whether Sanchez's "actions" themselves were reasonable under the circumstances, i.e., whether killing Aleasha was "a reasonable response for [Sanchez] under these circumstances." The District Court explicitly endorsed the prosecutor's incorrect articulation of the law when it overruled defense counsel's objection that the prosecutor was misinterpreting the instructions.

¶93    A virtually identical situation occurred in *State v. Jones*, 615 S.W.2d 416 (Mo. 1981), which the Missouri Supreme Court described as follows:

> Three things stand out about the argument in this case: First, the prosecutor told the jury [during closing argument] that a "reasonable belief" satisfied the requirement of proof beyond a reasonable doubt. . . . Thus, the

47

prosecutor in this case undertook to define reasonable doubt in wholly erroneous terms. Second: The prosecutor's statement was promptly objected to and the objections were overruled, giving the argument the imprimatur of the trial court. Third: The prosecutor was not content with a passing reference to the subject, but upon the overruling of defense objection, proceeded to repeat his erroneous definition of reasonable doubt.

*Jones*, 615 S.W.2d at 420 (citations omitted). The court reversed the convictions, noting that while the evidence of guilt was strong, the prosecutor's misstatements could not be excused as harmless.

¶94 In the case at hand, the Court reasons that the prosecutor informed the jury that the attorneys' closing arguments were not evidence. Opinion, ¶ 57. But the problem here is not that the prosecutor purported to provide evidence; the problem here is that the prosecutor purported to state the law of mitigated deliberate homicide and the District Court gave the prosecutor's misstatements the imprimatur of the court. The Court also reasons that the jury was presented with defense counsel's correct interpretation of the law. Opinion, ¶ 57. But the District Court never endorsed defense counsel's interpretation of the law; the court only endorsed the prosecutor's interpretation of the law, which was patently false.

¶95 "American jurisprudence depends on a jury's ability to follow instructions and juries are presumed to follow the law that courts provide." Opinion, ¶ 57 (citing *State v. Turner*, 262 Mont. 39, 55, 864 P.2d 235, 245 (1993), and *Opper v. United States*, 348 U.S. 84, 95, 75 S. Ct. 158, 165 (1954)). Accordingly, when the trial court imparts conflicting versions of the law and thereby inhibits the jury from correctly following the law, the resulting verdict cannot stand. Indeed, this Court has long recognized that the

giving of conflicting jury instructions on a material issue is reversible error. *See e.g. State v. Rolla*, 21 Mont. 582, 587, 55 P. 523, 525 (1898); *Wells v. Waddell*, 59 Mont. 436, 443-44, 196 P. 1000, 1002 (1921); *Skelton v. Great Northern Ry. Co.*, 110 Mont. 257, 261, 100 P.2d 929, 931 (1940); *Bohrer v. Clark*, 180 Mont. 233, 246, 590 P.2d 117, 124 (1978); *Swenson v. Buffalo Bldg. Co.*, 194 Mont. 141, 151, 635 P.2d 978, 984 (1981). In *Rolla*, the Court observed that "when conflicting propositions of law are given upon a material point, one correct and the other incorrect, the judgment will be reversed. It cannot be assumed in such case that the jury will follow the correct statement of the law." *Rolla*, 21 Mont. at 587, 55 P. at 525.

¶96   In the case at hand, the jury unquestionably received conflicting statements as to the law under § 45-5-103(1), MCA:  first, the court's correct instruction that Sanchez's *explanation or excuse for his extreme mental or emotional stress* had to be reasonable, and second, the prosecutor's incorrect statement, which received the imprimatur of the court, that Sanchez's *actions* had to be reasonable. Section 45-5-103(1), MCA, carves a fine line—one that is easily capable of being misunderstood by jurors, particularly when they receive conflicting statements as to its meaning. Under these circumstances, the Court's assumption that the District Court provided an unambiguous instruction on mitigated deliberate homicide is invalid.

¶97   Before concluding, I note that the Court has imposed on Sanchez a virtually insurmountable burden to demonstrate that he was prejudiced by the prosecutor's misstatements. As the Supreme Court observed in *Berger*,

> the average jury, in a greater or less degree, has confidence that [the obligations to govern impartially and to do justice], which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.

*Berger*, 295 U.S. at 88, 55 S. Ct. at 633. Along these same lines, we observed in *State v. Stringer*, 271 Mont. 367, 897 P.2d 1063 (1995), that improper comment by the prosecutor creates an unacceptable risk that jurors will simply adopt the prosecutor's views instead of exercising their own independent judgment. *See Stringer*, 271 Mont. at 381, 897 P.2d at 1071. Yet, there is no way that Sanchez can get inside the minds of the jurors in his case to determine whether this occurred—i.e., whether they rendered their verdict based on the law as incorrectly stated by the prosecutor and endorsed by the District Court. Moreover, even if a juror offered insight in this regard, Sanchez is prohibited from using juror testimony or affidavits to impeach a verdict based upon misapprehension of the law. *See* M. R. Evid. 606(b); *State v. Kelman*, 276 Mont. 253, 262, 915 P.2d 854, 860 (1996). As it turns out, the District Court's endorsement of the prosecutor's incorrect statement of the law establishes, in my view, that Sanchez was deprived of a fair trial and due process of law. But one is left to wonder how Sanchez, under the burden imposed by the Court, otherwise could have demonstrated prejudice as a result of the prosecutor's misstatements.

¶98 In this regard, I believe that the Court errs in not weighing the prosecutor's misconduct more heavily in the analysis. By refusing to recognize prejudice to Sanchez, the Court not only affirms the denial of his constitutional rights to due process and a fair

trial but also sends the message that there are no adverse consequences to prosecutorial misconduct of this nature. In my view, if a prosecutor knowingly flaunts the Montana Rules of Professional Conduct, repeatedly misrepresents the law to the jury, and blatantly ignores this Court's admonishment in a prior case not to misstate the law as instructed by the judge (*see* ¶ 89 n. 3, *supra*), these factors should be weighed heavily in determining whether the defendant was deprived of a fair trial and due process of law.

¶99 That said, the fact that the District Court imparted conflicting versions of § 45-5-103(1), MCA, to the jury is itself reversible error. If one accepts the premise that a jury which is given conflicting propositions of law cannot correctly follow the law, then the entire foundation of the Court's resolution of Issue III crumbles, as it should. In light of the prosecutor's repeated misstatements of the law and the District Court's endorsement of those misstatements, we simply cannot have confidence that the jury was able to properly consider the lesser included offense of mitigated deliberate homicide. *Cf. State v. Rogers*, 2001 MT 165, ¶¶ 14-22, 306 Mont. 130, ¶¶ 14-22, 32 P.3d 724, ¶¶ 14-22 (holding that the defendant was prejudiced because the jury's ability to consider the lesser included offense had not been "maximize[d]"). I conclude that Sanchez's constitutional rights to a fair trial and to due process of law were clearly violated. I therefore would reverse and remand this case for a new trial. I dissent from our failure to do so.

**Issue II**

¶100 In *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004), the Supreme Court announced a categorical bar to the admission of certain hearsay evidence at a

criminal trial. Specifically, the Supreme Court held that under the Sixth Amendment to the United States Constitution, the "testimonial" statement of a witness who is absent from trial is inadmissible unless the witness is unavailable to testify and the defendant has had a prior opportunity to cross-examine the witness. *See Crawford*, 541 U.S. at 53-54, 68, 124 S. Ct. at 1365, 1374. Although the Supreme Court identified three formulations of what constitutes a testimonial statement, *see Crawford*, 541 U.S. at 51-52, 124 S. Ct. at 1364, the Supreme Court did not adopt a specific definition, opting instead to define the term on a case-by-case basis, *see e.g. Davis v. Washington*, 547 U.S. 813, 126 S. Ct. 2266 (2006). However, as this Court notes in ¶¶ 34 and 36 of today's Opinion, the Supreme Court has suggested a number of considerations that are pertinent in determining whether a statement is testimonial—in particular, the statement's purpose, the statement's context, and the audience to whom the statement was made. None of these considerations is dispositive; rather, they inform the ultimate question of whether the declarant should have expected, under the circumstances, that the State would use his or her statements at trial. In other words, would a reasonable person in the position of the declarant have objectively foreseen or anticipated that his or statements might be used in the investigation or prosecution of a crime? *See United States v. Townley*, 472 F.3d 1267, 1272 (10th Cir. 2007), *cert. denied*, ___ U.S. ____, 127 S. Ct. 3069 (2007); *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004).

¶101 I agree with the Court's explanation of these principles in ¶¶ 34 and 36. I also agree with the Court's analysis in ¶¶ 37 and 38 of whether the statements contained in Aleasha's note were testimonial. As the Court observes, the nature of the note was

accusatory. It identified Aleasha's killer and the threatened means of execution, and it stated the exact time and date of Sanchez's reported threat. It purported to provide "some answers" regarding a crime that would certainly be prosecuted if sufficient evidence, such as the note, were available; and in this sense, the note's obvious purpose was to speak for Aleasha regarding her unexpected demise should she not be able to speak for herself, i.e., to provide incriminating testimony that Aleasha could not provide in person. It was addressed to a broad audience of persons who might be concerned about Aleasha's illness or death, and it was placed in a location where law enforcement was likely to find it. Indeed, the detective who found the note testified that he searched Aleasha's residence because he "felt that it was important to go there to look for any notes or written letters, any diaries, e-mails or just anything that might document some kind of a history," more specifically, "[a]ny kind of history of threats [being made to Aleasha]." Not surprisingly, when he found the note, he immediately recognized its "evidentiary value."

¶102 The State contends that Aleasha's note "does not reasonably purport to show an intent it would be used prosecutorially but only an intent to direct attention (possibly only medical attention) to the reasons for any suspicious illness." As the Court observes, however, this contention completely ignores the accusatory nature of the note. Moreover, I find it highly implausible that a person who intends to alert medical personnel to the reasons for a suspicious illness would place such information in a pile of correspondence and bills where it is not reasonably likely to be discovered by medical personnel in a timely manner, if at all. In any event, the State's argument also misapprehends the pertinent inquiry here, which is not what Aleasha specifically intended but, rather, what

53

an objective declarant reasonably would have expected under the circumstances, *Opinion*, ¶ 36, i.e., whether Aleasha should have understood (whether she actually did or not) at the time she wrote the note that there was a significant probability the statements contained therein would be used prosecutorially. Under the circumstances presented, an objective declarant in Aleasha's position would have anticipated that the statements contained in the note would be used in the investigation and prosecution of Sanchez.

¶103 Accordingly, I agree with the Court's analysis and conclusion that Aleasha's note contained testimonial statements. In addition, I agree with the Court's conclusion that the rule of forfeiture by wrongdoing applies in this case. However, I do not agree with the Court's explication of this rule.

¶104 In *Crawford*, the Supreme Court noted that the rule of forfeiture by wrongdoing is an exception to the Confrontation Clause's categorical bar against the admission of testimonial statements. *See Crawford*, 541 U.S. at 62, 124 S. Ct. at 1370. This exception, the Supreme Court noted, extinguishes confrontation claims on essentially equitable grounds. *See Crawford*, 541 U.S. at 62, 124 S. Ct. at 1370; *accord Davis v. Washington*, 547 U.S. 813, 126 S. Ct. 2266, 2280 (2006).

¶105 In *Davis*, the Supreme Court provided further insight into the scope of the forfeiture-by-wrongdoing exception. Addressing the argument that the nature of the offense charged in that case—domestic violence—required greater flexibility in the use of testimonial evidence against the accused, the Supreme Court noted that this particular type of crime is "notoriously susceptible to intimidation or coercion of the victim to ensure that she does not testify at trial" and that when this occurs, "the Confrontation

Clause gives the criminal a windfall." *Davis*, 126 S. Ct. at 2279-80. Notwithstanding, the Supreme Court held that "[w]e may not, however, vitiate constitutional guarantees when they have the effect of allowing the guilty to go free." *Davis*, 126 S. Ct. at 2280.

¶106 At the same time, however, the Supreme Court noted that the rule of forfeiture by wrongdoing may extinguish confrontation claims under certain circumstances:

> But when defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce. While defendants have no duty to assist the State in proving their guilt, they do have the duty to refrain from acting in ways that destroy the integrity of the criminal-trial system. We reiterate what we said in *Crawford*: that the rule of forfeiture by wrongdoing . . . extinguishes confrontation claims on essentially equitable grounds. That is, one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation.

*Davis*, 126 S. Ct. at 2280 (ellipsis in original; emphasis, citations, and internal quotation marks omitted).

¶107 This language—in particular, the Supreme Court's use of the verb "seek" in conjunction with "undermin[ing] the judicial process" and "destroy[ing] the integrity of the criminal-trial system"—as well as the Supreme Court's refusal to vitiate the right of confrontation because the charged offense is susceptible to intimidation or coercion of the victim-declarant indicate that the focus of the forfeiture doctrine is not solely on whether the defendant may benefit from his own wrongdoing. In other words, not all conduct by the defendant that happens to result in a witness's unavailability comes within the doctrine. Rather, the doctrine is directed specifically at conduct by which the defendant "seek[s]" or intends "to undermine the judicial process" or "destroy the integrity of the criminal-trial system" by procuring or coercing silence from witnesses and victims.

55

¶108   This conclusion is substantiated by the Supreme Court's observation in *Davis* that "Federal Rule of Evidence 804(b)(6) . . . codifies the forfeiture doctrine." *Davis*, 126 S. Ct. at 2280.   Federal Rule 804(b)(6) provides as follows:   "The following are not excluded by the hearsay rule if the declarant is unavailable as a witness: . . . A statement offered against a party that has engaged or acquiesced in wrongdoing that was *intended* to, and did, procure the unavailability of the declarant as a witness" (emphasis added, paragraph breaks omitted).   Again, according to *Davis*, this is a codification of the forfeiture doctrine, *Davis*, 126 S. Ct. at 2280; and by its own terms, the doctrine requires *an intent* to procure the declarant's unavailability as a witness.   Numerous courts have reached the same conclusion.   *See State v. Romero*, 156 P.3d 694, 702 (N.M. 2007) (citing cases, and concluding that the majority rule requires proof of an intent to prevent the declarant from testifying), *cert. dismissed*, ___ U.S. ___, ___ S. Ct. ___ (Jan 11, 2008); *see also People v. Stechly*, 870 N.E.2d 333, 348-53 (Ill. 2007) (analyzing the forfeiture doctrine and Fed. R. Evid. 804(b)(6) and concluding that intent is an element of the doctrine), *rehearing denied* (May 29, 2007); *People v. Moreno*, 160 P.3d 242, 246 (Colo. 2007) (noting that "the clear consensus in non-murder cases is that the doctrine requires a showing of an intent on the part of the defendant to prevent the declarant from testifying at trial"), *rehearing denied* (Jun. 25, 2007); *United States v. Gray*, 405 F.3d 227, 242 n. 9 (4th Cir. 2005) ("[T]he intent requirement in Rule 804(b)(6) continues to limit application of the forfeiture-by-wrongdoing exception to those cases in which the defendant intended, at least in part, to render the declarant unavailable as a witness against him.   Absent such intent, Rule 804(b)(6) has no application." (citation omitted)).

56

¶109   That said, I recognize that a case such as this—where the defendant has admitted to deliberately causing the victim's death through wrongdoing and, thus, causing the victim's absence from trial—presents an unusual situation.  There is no evidence in the record that Sanchez sought by this action to undermine the judicial process or to destroy the integrity of the criminal-trial system.  Indeed, there was no "judicial process" to undermine at the time Sanchez committed the homicide.  It would seem, therefore, that the rule of forfeiture by wrongdoing, as articulated in *Davis*, is inapplicable.  On the other hand, had Sanchez merely assaulted Aleasha, and had he then caused her absence from trial by admittedly threatening her, the forfeiture doctrine presumably would have applied.  Thus, we would be rewarding defendants who admittedly killed their victims through wrongdoing if we did not apply the same rule to them.  To avoid this anomaly, I conclude that where the defendant has admitted to deliberately causing the declarant's death through wrongdoing, then the forfeiture-by-wrongdoing exception applies to that specific declarant's out-of-court statements.[8]

¶110   On this basis, I conclude that the admission of Aleasha's note did not deprive Sanchez of his right of confrontation.  He procured Aleasha's unavailability by fatally shooting her, thereby rendering her unavailable as a witness, and he admitted to having engaged in this wrongdoing deliberately (albeit, with mitigating circumstances).

¶111   The Court reaches the same result; however, in so doing, the Court relies on principles broad enough to suggest that the forfeiture-by-wrongdoing exception applies

---

[8] I would not necessarily apply this rule where there is a justifiable use of force defense.  But since that is not an issue here, I leave that discussion for another day.

irrespective of whether the defendant had an intent to procure the declarant's unavailability as a witness. It is on this point that I believe the Court errs.

¶112 Throughout the Court's discussion in ¶¶ 40 through 46, the Court repeatedly refers to the "equitable basis" of the forfeiture-by-wrongdoing exception and the maxim that "no person should benefit from the person's own wrongdoing." Indeed, this maxim is the foundation of the Court's conclusion that Sanchez forfeited his right to confrontation in this case. *See* Opinion, ¶¶ 46-47. Yet, while *Crawford* and *Davis* refer to the "equitable" basis of the doctrine, neither opinion states that the doctrine applies broadly to prevent a defendant from "benefiting" from his own wrongdoing. Moreover, if the forfeiture-by-wrongdoing exception applied whenever a defendant would otherwise "benefit" from his own wrongdoing—whether or not that wrongdoing was intended to procure a declarant's unavailability as a witness—then the exception most certainly would swallow the rule. What if the victim-declarant is simply too frightened to face the defendant at trial? Has the defendant then "benefited" from his wrongdoing and thereby forfeited his right to confrontation? It would seem so under the broad language used by this Court.

¶113 The Court's approach of relying on general maxims and principles of equity contradicts the Supreme Court's unambiguous statement that "Federal Rule of Evidence 804(b)(6) . . . codifies the forfeiture doctrine," *Davis*, 126 S. Ct. at 2280, and the fact that Fed. R. Evid. 804(b)(6) requires an intent to procure the declarant's unavailability as a witness. The Court seems to dismiss the Supreme Court's statement in *Davis* as "primarily dicta," Opinion, ¶ 42, and to adopt the California Supreme Court's broad reasoning in *People v. Giles*, 152 P.3d 433 (Cal. 2007), *cert. granted*, ___ U.S. ___, ___

58

S. Ct. ___ (Jan. 11, 2008), namely, that " '[a] defendant whose intentional criminal act renders a witness unavailable for trial benefits from his crime if he can use the witness's unavailability to exclude damaging hearsay statements by the witness that would otherwise be admissible,' " Opinion, ¶ 43 (quoting *Giles*, 152 P.3d at 443). It is imprudent, however, to so readily dismiss the narrow version of the rule suggested in *Davis* in favor of the broad interpretation offered in *Giles*—particularly since we are speaking of a constitutional right and since the result of the Court's broad, sweeping statements in ¶¶ 40 through 46 to the effect that the doctrine applies to any wrongdoing by a defendant from which he or she happens to "benefit" will most surely be to render that constitutional right subject to exception more often than not. In my view, the defendant's intent *is* an element of the forfeiture-by-wrongdoing exception, and the Court errs to the extent it suggests otherwise.

¶114 In sum, I agree with the Court's analysis and conclusion that Aleasha's note contained testimonial statements. Furthermore, I agree with the Court that the forfeiture-by-wrongdoing exception applies on the facts of this case. However, I strenuously disagree with the Court's suggestion in ¶¶ 40-46 that the exception applies whenever a person would otherwise benefit from his or her own wrongdoing.

**Issue I**

¶115 As noted at the outset, I agree with the Court's resolution of Issue I. However, because we will, no doubt, confront the matter of adopting the forfeiture-by-wrongdoing exception to the hearsay rules in some other context, I believe that it is appropriate to respond briefly to Justice Rice's arguments on this point (*see* Concurrence, ¶¶ 65-68).

59

¶116 I respectfully disagree that we should adopt this exception to the hearsay rules, either by way of our caselaw or by an amendment to the Rules of Evidence. My rationale is grounded in the nature of hearsay evidence and in the reasons we reject hearsay evidence as a general rule and admit it, as exceptions to the general rule, only under narrowly-defined circumstances. Indeed, if the purpose of our courts is to "search for truth," Concurrence, ¶ 68, then we ought not to disregard the two elemental principles underpinning the law of hearsay.

¶117 First, as a general rule, "[h]earsay is *not admissible* except as otherwise provided by statute, these rules, or other rules applicable in the courts of this state." M. R. Evid. 802 (emphasis added). As noted in the Commission Comments to Rule 802, "the rule that hearsay is inadmissible has been followed in Montana without question since the early case of *Davis v. Blume*, 1 Mont. 463, 465 (1872)." This broadly-stated prohibition reflects the well-settled view that out-of-court statements are presumptively unreliable, given that the declarant's perception, memory, and veracity cannot be tested in the presence of the fact-finder while under oath and subject to cross-examination. As explained by the United States Court of Appeals for the Second Circuit:

> The hearsay rule is generally said to exclude out-of-court statements offered for the truth of the matter asserted because there are four classes of risk peculiar to this kind of evidence: those of (1) insincerity, (2) faulty perception, (3) faulty memory and (4) faulty narration, each of which decreases the reliability of the inference from the statement made to the conclusion for which it is offered. The hearsay rule ordinarily prohibits the admission of out-of-court statements by declarants on the theory that cross-examination can help test for these four classes of error, thus allowing the fact-finder to weigh the evidence properly and to discount any that is too unreliable.

*Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 232 (2nd Cir. 1999) (citations omitted); *see also United States v. Shukri*, 207 F.3d 412, 417 (7th Cir. 2000) ("Hearsay testimony is presumptively unreliable under the common law because the opposing party has no opportunity to cross-examine and test the declarant's truthfulness under oath before the factfinder." (citing 5 John H. Wigmore, *Evidence in Trials at Common Law* § 1368, at 37, § 1420, at 251 (rev. ed. 1974), and *McCormick on Evidence* § 245, at 728 (Edward W. Cleary ed., 3d ed., 1984))). The opportunity for the fact-finder to weigh the declarant's sincerity, perception, memory, and narration and to discount any testimony that is too unreliable is lost where that evidence is admitted by way of a third party who simply repeats the declarant's statements in court.

¶118 Second—and this principle follows from the first—the exceptions to the general prohibition against hearsay evidence are grounded in "circumstantial guarantees of trustworthiness," M. R. Evid. 804(b)(5), i.e., a consensus that out-of-court statements made under certain circumstances are sufficiently reliable to allow their admission notwithstanding the declarant's absence. *See e.g.* Commission Comments to M. R. Evid. 803(4) ("The guarantee of trustworthiness [underpinning the statements-for-purposes-of-medical-diagnosis-or-treatment exception] is provided by the patient's motivation for proper diagnosis and treatment."); Commission Comments to M. R. Evid. 803(6) ("The guarantee of trustworthiness [underpinning the records-of-regularly-conducted-activity exception] is provided by the nature of the record and the circumstances of preparation, enhanced by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an

accurate record as part of a continuing job or occupation." (internal quotation marks omitted)); *see also Schering Corp.*, 189 F.3d at 233 ("[T]he trustworthiness of [the traditional exceptions to the hearsay rule] is a function of their ability to minimize some of the four classic hearsay dangers.").

¶119 In sum, as a general rule, the admission of hearsay evidence is *not* a reliable and trustworthy vehicle for finding "truth"; rather, this form of evidence frustrates that search, which is why Rule 802 exists in the first place. But we admit certain categories of hearsay testimony where the law has determined, based on historical evidence and practice, that there are circumstantial guarantees of reliability and trustworthiness built into these categories of hearsay testimony and that these types of evidence, therefore, may enhance or further the search for truth.

¶120 The forfeiture-by-wrongdoing exception, however, is not based on any notion of reliability or trustworthiness. Indeed, the fact that an actor engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness provides no indication whatsoever as to whether that declarant's out-of-court statement is reliable or trustworthy. The statement may be true, or it may be a complete fabrication. It may be based on accurate information or on a complete misperception of the events in question. It may be reliable due to one or more of the circumstances that underlie the other exceptions to the hearsay rule, or it may have no independent and inherent indicia of reliability and trustworthiness at all. It might, in the first instance, enhance the search for truth, or it might, in the second, significantly frustrate or obviate that search altogether.

¶121 For these reasons, I disagree that the forfeiture-by-wrongdoing exception serves a role in the "search for truth." Rather, application of the exception results in a conclusive presumption about *the truth* of a declarant's out-of-court statement based solely on *the alleged conduct* of the accused. More to the point, in most instances, application of the exception is about punishing the alleged conduct *for which the actor is on trial and of which he or she is presumed innocent*; it has nothing to do with facilitating the search for truth by admitting presumably reliable out-of-court statements.

¶122 We have always examined evidence objected to on hearsay grounds through the lens of circumstantial guarantees of trustworthiness, and it seems dangerous to me to eliminate this perspective for an entire category of statements. Once we discard this analysis for one category of evidence, why not do it for others? I cannot agree with so readily tossing out our historical litmus test.

¶123 Thus, irrespective of Federal Rule of Evidence 804(b)(6),[9] hearsay statements offered in Montana courts against a party who engaged or acquiesced in wrongdoing that

---

[9] This Court has long refused to march lock-step with federal interpretations of corresponding constitutional provisions. *See e.g. State v. Johnson*, 221 Mont. 503, 512-14, 719 P.2d 1248, 1254-55 (1986); *Buckman v. Montana Deaconess Hosp.*, 224 Mont. 318, 324, 730 P.2d 380, 384 (1986); *State v. Bullock*, 272 Mont. 361, 383-84, 901 P.2d 61, 75-76 (1995); *Ranta v. State*, 1998 MT 95, ¶ 25, 288 Mont. 391, ¶ 25, 958 P.2d 670, ¶ 25; *Woirhaye v. District Court*, 1998 MT 320, ¶ 14, 292 Mont. 185, ¶ 14, 972 P.2d 800, ¶ 14. Montana also does not march lock-step with federal procedural and evidentiary rules. *See e.g.* Table C, *Montana Rules of Evidence Differing from Federal Rules of Evidence*, Title 26, Chapter 10, MCA (Annotations 2006). Likewise, the mere fact that the federal government has adopted the forfeiture-by-wrongdoing exception in the Federal Rules of Evidence is not itself a principled ground for adopting the exception as part of the Montana Rules of Evidence. Contrary to Justice Rice's concurrence, this is not to say that "consideration" of the approaches taken by the federal government and our sister states is unprincipled. Concurrence, ¶ 66 n. 1. Rather, it is to say that wholesale adoption of the exception merely because others have done so would be unprincipled.

was intended to, and did, procure the unavailability of the declarant as a witness must continue to be evaluated on a case-by-case basis under existing hearsay law. If the statement offered is hearsay, then it should not be admitted absent the statement's falling under one of those narrow hearsay exceptions that is historically grounded in independent and inherent indicia of reliability and trustworthiness. The rules of evidence must remain a neutral medium which facilitate the search for truth; they must not become instruments of punishment.

**Conclusion**

¶124 Based on my analysis under Issue III, I conclude that this case should be reversed and remanded for a new trial. I dissent from the Court's contrary decision. As to Issue II, I agree with the Court's analysis and conclusion that Aleasha's note contained testimonial statements, and I agree with the Court that the forfeiture-by-wrongdoing exception applies to Sanchez's confrontation claims; however, I reach the latter conclusion concerning the applicability of the forfeiture-by-wrongdoing exception on a narrower ground than the rationale underlying the Court's decision.

/S/ JAMES C. NELSON
/S/ PATRICIA COTTER


Chief Justice Karla M. Gray, dissenting.

¶125 I join Justice Nelson's dissent on Issue III and would reverse and remand for a new trial on that basis. Like Justice Nelson, it is my view that, if the Court reached the

correct result on this issue, there would be no need to address the others. Because various views on Issues I and II are offered by others, I will do so as well, but only briefly.

¶126 On Issue I, I would not adopt the forfeiture by wrongdoing exception to the hearsay rules for the reasons expressed by Justice Nelson. This is a matter best considered on a case-by-case basis, at least until such time as we have sufficient experience with the doctrine here in Montana to consider it more knowledgeably.

¶127 On Issue II, I join Justice Rice's analysis of whether Aleasha's note is testimonial. I would conclude it is not testimonial, for the reasons so cogently stated by Justice Rice. I also believe Aleasha's lack of fear or concern through the course of events which occurred in this case—that is, the several threats and going out to Sanchez's vehicle on the very day she was killed—buttresses that analysis.

¶128 Moreover, I have grave concerns about the forfeiture by wrongdoing doctrine in certain cases. In this regard, I agree with Justice Nelson that forfeiture by wrongdoing should not apply in a deliberate homicide case involving the defense of justifiable use of force (that is, self-defense). It also is my view, however, that the doctrine is not applicable in this case where the defense of mitigated deliberate homicide is asserted.

¶129 I understand full well the notion and maxim that no one should benefit by his or her wrong. Indeed, that maxim underlies many legal subject areas, including fraudulent inducement in entering—and tortious interference with—a contract, and most other situations in which a party comes to a court without clean hands. It may well be that forfeiture by wrongdoing should apply as well in certain criminal cases, but I would not apply it here.

¶130 A bedrock principle of criminal law in this country is the constitutional right to confront one's accusers. Another is the requirement that the prosecution prove its case beyond a reasonable doubt. Another—perhaps the most—bedrock principle of criminal law is the presumption of innocence. It is difficult for me to embrace the notion that an "equitable" basis such as forfeiture by wrongdoing can sweep away one's constitutional confrontation rights. Indeed, it strikes me that—in a case such as this where the defense is to admit that the offense was committed but to offer the defense of mitigation—the opportunity to reasonably present the defense is effectively trumped by the admission of evidence that repeatedly highlights the wrongdoing. Thus, while the Court is correct, ¶ 47, that it is the purposeful causing of the death of another which prevents the ability to exercise the right to confront the deceased, the purposeful death was not committed for the purpose of avoiding the confrontation. Stated differently, had there been a homicide for the purpose of preventing the victim from testifying or assisting in a criminal prosecution, I would agree that forfeiture by wrongdoing properly would apply; other factual situations might also support application of the doctrine. I cannot join the Court in applying it here.

¶131 I would reverse and remand for a new trial on prosecutorial misconduct in this cause number.

/S/ KARLA M. GRAY

66